## CONWAY ET AL. *vs.* TAYLOR'S EXECUTOR.

1. A ferry franchise on the Ohio is grantable, under the laws of Kentucky, to a citizen of that State who is a riparian owner on the Kentucky side; and it is not necessary to the validity of the grant that the grantee should have a right of landing on the other side or beyond the jurisdiction of the State.

2 The concurrent action of two States is not necessary to the grant of a ferry franchise on a river that divides them. A ferry is in respect to the landing, not to the water; the water may be to one, and the ferry to another.

3. After a citizen of Kentucky has become the grantee of a ferry franchise, and his riparian rights have been repeatedly held sufficient to sustain the grant by the highest legal tribunal of the State, the same question is not open here; the adjudications of the State courts are a rule of property and a rule of decision which this court is bound to recognise.

4. A license to establish a ferry which does not extend across the river may be less valuable for that reason, but not less valid as far as it goes.

5. The laws of Kentucky relating to ferries on the Ohio and Mississippi are like the laws of most, if not all, the other States bordering on those rivers: they do not leave the rights of the public unprotected, and are not unconstitutional. The franchises which the State grants are confined to the transit from her own shores, and she leaves other States to regulate the same rights on their side.

6. A ferry franchise is property, and as sacred as other property.

7. An injunction to protect the exclusive privilege to a ferry does not conflict or interfere with the right of a boat to carry passengers or

---

goods in the ordinary prosecution of commerce without the regularity or purpose of ferry trips; that remedy applies only to one which is run openly and avowedly as a ferry-boat.

8. The authority to establish and regulate ferries is not included in the power of the Federal Government to "regulate commerce with foreign nations and among the several States and with the Indian tribes:"

9. The authority to regulate ferries has never been claimed by the General Government, has always been exercised by the States, never by Congress, and is undoubtedly a part of the immense mass of undelegated powers reserved to the States respectively.

Appeal from the Court of Appeals for the State of Kentucky.

James Taylor, executor of James Taylor, deceased, and Robert Air, filed their bill in equity in the Circuit Court of Campbell county, Kentucky, against Peter Conway, John J. Simmons, John Sebree, Ernest Klinschmidt, Bernard Delmar, John Schenburg, Thomas Dodsworth, Daniel Wolff, and the Common Council of the city of Newport. The prayer of the bill was, that defendants might be enjoined from invading certain ferry rights claimed by plaintiffs as set forth in their bill. An account was also prayed for, and a decree against the defendants, in respect of the moneys received by them in violation of the rights of complainants. The defendants filed answers to the bill, and after the taking of much testimony and hearing of the cause, a decree was passed for plaintiffs in accordance with the prayer of their bill. From this decree defendants appealed to the Court of Appeals of the State of Kentucky, where an order was entered modifying the decree of the court below, but still adverse to defendants. The cause was then removed to the Supreme Court of the United States upon a writ of error under the 25th section of the judiciary act.

All the leading facts of the case are stated in the opinion of Mr. Justice *Swayne*.

*Mr. Stanbery*, of Ohio, for appellants. In considering the nature and extent of the title set up by the plaintiffs below we have only to look to their ferry license from Kentucky; and

their coasting license from the United States. And as their case is founded on an exclusive privilege to which the United States license does not extend, they must be confined wholly to their ferry license. This, by their own showing, is a ferry license from the Kentucky side to the Ohio side, not from the Ohio side also to the Kentucky side; and although they ask an injunction against running our boat "between Cincinnati and Newport," yet the decree below only finds the ferry right to extend *from* Kentucky *to* Ohio, and not *from* and *to* both sides of the river; and the injunction is accordingly limited against transportation by our boat *from* the Kentucky shore. The decree of the Court of Appeals finds that the place of landing of the Commodore, our boat, on the Kentucky side, is at a public landing; that the right of wharfage at that place belongs to the city of Newport; and that the owners of the Commodore had a right, under the city of Newport, to land their boat at that place.

Here, then, we have as established facts, a navigable river dividing two States, a public wharf, and a vessel navigating the river under a license from the United States, and a decree, notwithstanding the license, which forbids that vessel to transport persons or property from that landing across the river to the opposite shore.

Whilst this injunction remains, a single voyage or trip by our boat, carrying persons or property, from our wharf in Kentucky to the Ohio side, is forbidden; our license affords no protection to us for any sort of transportation from that landing across the river. If, after this decree, the Commodore should be engaged in commerce between Pittsburg and Cincinnati and intermediate ports, and should touch at Newport, she might land passengers and freight, but could not receive passengers or freight to be transported to Cincinnati; so that, by this decree, her right under the license of the United States is to that extent annulled. The decree, therefore, is erroneous in the extent to which it goes, and on that ground it should be reversed.

But the license of the Commodore should have protected her in making regular trips as a ferry boat between Cincinnati and

Newport. The only ground upon which she is prohibited from doing so is that such transportation is in violation of a ferry franchise granted to appellees by the State of Kentucky. No such ferry franchise exists. It cannot be denied that the license of the Commodore gives her the right to the free navigation of the river to and from all the ports upon it, at least until some paramount and exclusive right is shown on the other side. The appellees accordingly set up an exclusive and paramount right in virtue of a ferry franchise. They deduce this franchise from the State of Kentucky alone, and under that grant they claim in their bill an exclusive right to carry on all the transportation across the river from and to both sides. The Circuit Court of Campbell county sustained their franchise to the full extent; but in the Court of Appeals the franchise was limited to a ferry franchise *from* Kentucky *to* Ohio, and denied as to a ferry franchise *from* Ohio *to* Kentucky.

Kentucky possesses no *exclusive* jurisdiction even to the middle of the river, and has no power to grant an exclusive right over any part of it; the *compact* makes all jurisdiction over the river *concurrent*, and this compact, by adoption, has become a part of the law of the United States. *Wheeling Bridge* case, (13 How., 518.)

It is said that "a corporation can have no legal existence out of the sovereignty by which it is created." Ang. and Ames on Corps., Sec. 161. And this is equally true of all other franchises.

Take the case of a franchise for a toll-bridge across the Ohio, only authorized by a grant from Kentucky, and to make the supposed case parallel with the case at bar, let the Kentucky franchise only authorize the bridge and transportation over it *from* Kentucky *to* Ohio; could such a franchise be sustained or pleaded in restriction of any common right, lawfully exercisable, if no valid franchise existed?

The boat was engaged, under the authority of the United States, in carrying on lawful commerce, over a navigable river, between Ohio and Kentucky. In opposition to this *prima facie* right, the appellees set up an exclusive and paramount right to carry on all the commerce across the river from Kentucky to

Ohio, at the same place, and so far to forbid and restrict our right. Admitting, for the purpose of the argument on this point, that a ferry franchise would have such effect, we say no such franchise can exist by authority from Kentucky alone, and none other is set up by the appellees. Nor can it be said, that aside from a ferry franchise, Kentucky can, under her sovereign power, lay an embargo upon this commerce along the shore of the river within her jurisdiction. That power was surrendered to the United States.

But if the appellees had shown a valid ferry franchise over the Ohio river, the running of defendants' boat, even if engaged in the business of ferriage, could not be enjoined by the appellees. She was engaged in commerce between the two States, over a navigable river, for transportation of persons and things across such a river is commerce, under whatever name it may be carried on.

Now if we admit that the business of ferriage, when applied to such commerce, is subject to police regulations by one or both the States, there was no valid ground upon the footing of their franchise upon which the appellees were entitled to enjoin this boat.

The statutes of Kentucky recognise what is called a ferry right on the Ohio river as a riparian right of the owner of the coast bordering on the river, and the franchise to exercise this right is grantable to such riparian proprietor exclusively. None but a resident of Kentucky can have a ferry grant; the riparian proprietor has an exclusive right to the grant; no new ferry can be established within one mile and a half of an established ferry, except where an impassable stream intervenes, or in front of a town, and then not within four hundred yards of the established ferry.

Under the influence of this exclusive grant the commerce across this great river has been embarrassed for more than a quarter of a century; not merely in so far as the citizens of Ohio are concerned, but also to the detriment of the citizens of Kentucky. As early as the year 1830 attempts were made, on the Kentucky side of the river, towards relief; in that year the trustees of Newport applied for the grant of another ferry.

The case is reported in 6 J. J. Marshall, 134. The application was refused on the ground that Taylor owned the entire river front at Newport, and, as such riparian proprietor, was exclusively entitled to all ferry rights belonging to it. The court say: "It does not certainly appear, whether or not the public interest requires the establishment of another ferry; but as the parties have waived that question, we will consider it on the ground on which they have placed it. That ground was, the ownership of the river bank in front of Newport, and it was held to be in Taylor; so that application failed.

In the year 1850 the Common Council of Newport made another application for a ferry. This application, after being granted by the County Court, was resisted by Taylor, and taken to the Court of Appeals. It is reported in 11 B. Monroe, 361.

The application failed. This case settled the question as to any second ferry from Newport; and it is a conclusive construction of the Kentucky statutes as to ferries across the Ohio, that, no matter what may be the demands of public convenience, no new ferry can ever be established there without the consent of Taylor or his heirs. It surely does not require argument to show that such an interdict upon commercial intercourse over the Ohio river, under whatever name it may be established, is an unlawful regulation.

This interdict, as we have seen, was established upon the footing of an exclusive ferry license, and an exclusive riparian ferry right. But what foundation supports these ferry privileges; what gives them birth and calls them into exercise? Simply the public convenience—nothing else. The proprietary ferry right which Kentucky undertakes to confer upon her citizens who own land on the Ohio river, cannot be exercised without a license from the State. It is a right in which the public are concerned, and no license is given to the riparian proprietor until the public convenience requires a ferry.

The foundation of the grant, therefore, is the public convenience. This is universal law, as well as Kentucky law, for ferries are *publici juris.* When, then, public convenience, in aid of which one ferry is established, in the progress of time

requires a second ferry within a mile of the first, how can it be said that this public convenience shall be baffled and frustrated by the prior grant? It may be that a second ferry is more imperatively necessary, within that distance, than was the first; and yet the very grant, made solely to subserve the public convenience—not for private profit, but for public profit—becomes the instrument to oppose and to frustrate the very end for which it was established.

It is true, the court in the case quoted indicate one remedy, and that is, an application to the Legislature of Kentucky for another ferry. We do not know what might be the result of such an application, nor is it at all material to inquire or speculate about. We are just now only concerned as to the ferry regulations which the Legislature has made, and not as to those which may be made. If we show a State regulation which is repugnant to a Federal right, our relief is not to be sought from the grace and favor of the State, but by an appeal to the Federal authority.

This case was brought to test the validity of these commercial restrictions. The Commodore, with a license from the United States, and with a lease from the city of Newport to use the public wharf at the foot of Monmouth street as a place of landing, embarked in the business of transportation across the river. No proceedings were instituted against her by the State of Kentucky, or under public authority; but she has been enjoined at the instance of private persons upon the ground of certain ferry regulations, which in effect give them a monopoly of all the navigation and commerce from the entire river front of the city of Newport. The Court of Appeals says that our voyage from Ohio to the public landing is lawful. No ferry franchise or riparian right is allowed to prevent that sort of transportation, because Kentucky has chosen to that extent to admit the public right of navigation. But as to the return voyage our boat must go empty; not a person or thing can be taken back. What is called by the Court of Appeals *an interdict* forbids it. "To this extent," says the court, "the State claims jurisdiction for the protection and preservation of her own established ferries, and by virtue of

her sovereignty over her own territory, on which, in the cases prohibited, persons and property must be landed from or received for transportation across the river." From this language one would infer that the court had reference to a subject-matter purely of State cognizance and regulation—a subject-matter over which, in virtue of her sovereignty, the State possessed absolute control and power to establish regulations looking exclusively to her own grants and the privileges and franchises created by herself.

We see, however, that this State-sovereignty is not claimed by the court to extend beyond the Kentucky shore, but is confined to her "own territory, on 'which, in the cases prohibited, persons and property must be landed." But are we to infer from this that Kentucky, in virtue of her sovereignty over the Kentucky coast on the Ohio river, can make any sort of regulation, however much it may interfere with navigation and commerce? or that she can establish, according to her own supreme discretion, exclusive grants and privileges which shall interdict all other commerce from her shores? What would the navigation of the Ohio be worth if such embargoes could be laid along the coast? and especially on what a tenure should we hold the public right of commerce and intercourse between the States? These great public rights do not come under State sovereignty even when their exercise requires the use of her soil. This court has said in *Turner* vs. *Boston,* (7 How., 283,) that commerce does not stop at the boundary line of a State, nor is it confined to acts done on the water. It extends to such acts done on the land as interfere with, obstruct, or prevent its due exercise.

It is further said by the Court of Appeals, that "The right thus claimed by the State over its own territory on the river, and for the protection and benefit of its own grantees of the ferry privilege, it has not at any time denied to the States on the other side." In other words, as Kentucky requires a landing on the Ohio side to make her own ferries available, she therefore concedes to the Ohio ferry a similar privilege of landing on the Kentucky shore; but beyond this privilege of transportation from Ohio and disembarkation on Kentucky

*Conway et al.* vs. *Taylor's Executor.*

soil, no further privilege is given to the Ohio ferryman. Here Kentucky does not regulate, but forbids. She does not say to the Ohio ferryman, you shall provide a safe boat; keep your landings in repair; run at convenient intervals; and make reasonable charges: all these would be regulations; but she absolutely forbids. If Ohio, under the useful power of regulation, had pursued a similar policy, what intolerable annoyance would have followed. Then, on both sides of the river, exclusive ferry franchises and exclusive riparian rights would bring all the commerce and intercourse across the river to this singular condition—that each ferry could transport only in one direction; and that as half the trips of each ferry would be without freight or passengers, and therefore without compensation, the charge for the transportation one way must be so increased as to cover the expense of the return trip. Such a regulation just doubles the charge upon the public. By means of these regulations, Kentucky has in fact monopolized all the commerce between Cincinnati and Newport, for no ferry can ever be run from the Ohio shore while this interdict upon the return voyage remains.

The Court of Appeals of Kentucky has not always been so clear upon the point of Kentucky sovereignty in the matter of these exclusive ferry regulations. Vide *Arnold* vs. *Shields*, (5 Dana, 18.)

Now, aside of the compact between Virginia and Kentucky, which recognises a concurrence of jurisdiction over the Ohio river in the States which lie upon its border, the same result would follow if the exclusive jurisdiction of Kentucky extended, as has been sometimes argued, to low-water mark on the Ohio shore. Such exclusive jurisdiction is subordinate to the intercourse and commerce across this river between the two States, and this common right is secured not only by the compact, which has become by adoption a statute of the United States, but by the Federal Constitution.

We maintain, therefore, that the statute of Kentucky securing to the appellees an exclusive right, not merely to transport persons and things at their ferry, but to prevent all ferriage or transportation along the river shore, for a prescribed distance

above and below, under any circumstances and without any regard to the public necessity or convenience, is unconstitutional; and that there was error in the decree of the Court of Appeals, in holding this enactment as paramount to the right of the Commodore under her license from the United States. *Gibbons* vs. *Ogden,* (9 Wheaton, 1.)

The *Wheeling Bridge* case (12 How., 630) settles principles which must control the case at bar.

1. The bridge belonged to the class of subjects which appertain to State regulation, for it was entirely within the State of Virginia, both abutments being on the soil of that State.

2. In authorizing the bridge the State of Virginia had made such regulations concerning the structure as were deemed in her discretion no obstruction to navigation.

3. Navigation in respect to all vessels was unimpeded, except that, as to six or seven large steamers, the height of the bridge was an obstruction in certain stages of water.

Notwithstanding all this, the bridge, so erected under State regulation, was declared by this court to conflict with the commerce and navigation of the river.

Furthermore, the assertion of this right was not founded upon any special authority from the United States, in the form of a coasting license, but upon the common right to the free navigation of the river; and, consequently, the right of the owners of the Commodore to free navigation, uninterrupted by obstructions, embargoes, or exclusions, under State authority, would have been perfect even without the coasting license, and its denial by the State judiciary would authorize the intervention of this court.

*Mr. Stevenson,* of Kentucky, for appellees. We shall maintain for the appellees, that the statutes of Kentucky establishing and regulating ferries over the Ohio and Mississippi rivers, within the Commonwealth of Kentucky, constitute a legitimate exercise of State sovereignty, are clearly within the reserved powers of the State, and are not inconsistent with, or antagonistic to, the Constitution of the United States, or any statute passed by Congress in pursuance thereof; and that if the es-

tablishment and regulation of ferries over the Ohio and Mississippi rivers were conceded to be commercial regulations, within the scope of Federal authority, the State statutes would still be valid, until Congress had exercised its power of regulating ferries over these rivers by direct legislation, which has not been done.

It may be safely affirmed, that there is scarcely a State in the Confederacy, lying upon a river, which has not, from the adoption of the Constitution, and before that period to the present time, claimed and exercised, without question, the exclusive right of establishing and regulating ferries over the rivers thus constituting their boundary.

So long an exercise of sovereign power by States, without dispute, during the entire period of a generation or more, of those who framed the Constitution, and were most active and distinguished in the leading cases in which its construction was to receive a permanent impress, is a fact which, while of itself it cannot enlarge the reserved rights of the States, affords the most persuasive proof of the popular acquiescence in the justice of the claim, and the propriety of its exercise by the respective States, rather than by the Federal Government.

This long and hitherto unquestioned right of the State governments to establish and regulate ferries has not been confined to rivers like the Ohio, Mississippi, Cumberland, Tennessee, Susquehannah, Potomac, and the Delaware, but anterior to the adoption of the Federal Constitution, and continuously since the States have exercised the exclusive jurisdiction of establishing ferries over our largest lakes separating States; and New York established, at an early day, a ferry over Niagara river, the boundary line between the United States and Canada, and its judicial action in this particular was upheld by an eminent judge now upon this bench. *People* vs. *Babcock,* (11 Wendell, 587;) *Gibbons* vs. *Ogden,* (9 Wheat., 1.)

When the Revolution took place the people of each State became sovereign, and in that character held the absolute right to all their navigable waters, and the soils under them, for their own *common use,* subject only to the rights since surrendered by the States to the General Government. *Martin* vs. *Waddell,* (16 Peters, 410.)

The Government of the United States is one of limited powers. It can exercise authority over no subjects, except those which have been delegated to it. *New Orleans* vs. *The United States,* (11 Peters, 735;) *Pollard's Lessee* vs. *Hagan and others,* (3 How., 223.)

That the Ohio river was wholly within the limits of Virginia up to 1st March, 1784, cannot be doubted. Upon that day she granted to the United States "all the right, title, and claim, as well of soil as of jurisdiction, which this Commonwealth hath to the territory or tract of country within the limits of the Virginia charter, situate, lying, or being to the northwest of the river Ohio," &c.

This language, not less by its terms than by the judicial construction uniformly given to it in Federal and State courts, made the northwestern margin of the Ohio river the southern boundary of the territory described in this deed of cession to the United States.

Virginia retained in full and absolute ownership all which was not disposed of, and the entire river Ohio, and every portion of it, remained her property, and subject to her jurisdiction, and so continues, except so far as this right has been alienated and parted with. The title of Virginia was admitted by Congress to the territory ceded by its resolution of 6th September, 1780, asking for its cession to aid in the accomplishment of the Revolution, by the act of 13th September, 1783, declaring the terms on which the cession would be accepted, by resolution of 1st March, 1784, announcing the acceptance of the deed of cession, by the resolution of July 7, 1786, requesting Virginia to revise and so to alter such deed of cession as *to empower the United States* to make a division of the territory granted unto the proposed new States, and especially by the ordinance of July 13, 1787, in which it is declared that "there shall be formed in the said territory not less than three, nor more than five States, and the boundaries of the States, as soon as Virginia shall alter her deed of cession, and consent to the same, shall become fixed," &c.

These various acts would seem to constitute an estoppel on the United States, and upon Ohio claiming under that title. So, too, this court held on this question. "But when, as in

this case, one State is the original proprietor, and grants the territory on the one side only, it retains the river within its dominion, and the new created State extends only to the river. The river, however, is its boundary." *Handly* vs. *Anthony et al.*, (5 Wheaton, 379.) It is equally unquestionable that, under the various acts of the Legislature of Virginia and of Congress, Kentucky, for the whole extent that her soil touches the Ohio river, has succeeded to the territorial rights and sovereignty of Virginia, subject only to the restrictions and conditions embraced in these statutes, none of which interfere with the question now in issue. The extent of Kentucky upon the Ohio river is as clearly the same, and her jurisdiction and her water-line the same, as had been that of Virginia prior to the deed of cession of Virginia to the United States in 1784.

The boundary between Virginia and Kentucky is an interior line, except where they cross the Ohio river.

Congress, by an act approved 4th February, 1791, (1st Statutes at Large, 189,) consented that the said district of Kentucky, within the jurisdiction of the Commonwealth of Virginia, and according to its actual boundary on the 18th December, 1789, should, upon the 1st day of June, 1792, be formed into a new State, and as such be received and admitted on that day into the Union.

This act of 18th December, 1789, is what is known as the compact with Virginia. There was no State formed out of the territory ceded by Virginia to the United States at the passage by Congress, on 4th February, 1791, of the act admitting Kentucky. The United States was the sole proprietor and coterminous owner of the territory north of the Ohio river, and is bound by the consent of Congress that Kentucky should be formed into a State, according to its actual boundaries on 18th December, 1789.

The solemnity of a compact by Congress is thus given to this boundary line, as it existed in December, 1789, as that which separated Kentucky from the Northwestern Territory.

The subsequent admission of Ohio, Indiana, and Illinois into the Union, could not abridge or modify the terms of this

compact by varying the boundary line without the consent of Kentucky.

Kentucky has always claimed that the counties within her territory, calling for the river Ohio as a boundary line, extended to the low-water mark on the northwestern side of the Ohio river. *Church* vs. *Chambers*, (3 Dana, 278;) *McFall* vs. *Commonwealth*, (2 Metcalfe, Ky. R., 394;) Stanton's Ky. Revised Statutes, 211; 4 J. J. Marshall, 158; *McFarland* vs. *McKnight*, (6 Ben. Mon., 510.)

And that claim seems to have been fully sustained by this court, in the case of *Handly* vs. *Anthony et al.*, already cited.

The sovereignty of Kentucky is, therefore, vested to low-water mark on the northern bank of the Ohio river.

To this extent its jurisdiction is as unbounded as over any other portion of its territory; subject, however, to any limitation or restriction of the Constitution of the United States, or the laws of Congress passed in pursuance thereof.

We concede, that, in the compact between Virginia and Kentucky, the free navigation of the Ohio river is guarantied.

The ferry statutes of Kentucky are, it is submitted, in no way inconsistent with the free use and navigation of the Ohio river as a national highway.

The control by States of ferries and ferry landings are clearly police regulations.

It is claimed by the other side that the powers delegated to Congress "to regulate commerce among the States," is an implied restriction upon the jurisdiction of the States over the Ohio and similar rivers, and all State laws granting exclusive ferry privileges, upon such streams, are upon this ground null and void.

To test the truth of this assumption, let the consequences which must follow its adoption be exhibited.

The right to a ferry does not at all depend upon the right to, or property in, the waters over which it passes. The right of ferry is a franchise, consisting in the right to transport persons, carriages, vehicles, &c., for hire, and therefore the property of waters may be in one, and the right of ferry in another. 15 Pickering's Rep., 253; 2 Hilliard on Real Prop-

erty, 51. Ferrymen have the same common right to navigate these waters with their boats, as fishermen, coasters, or ship-masters, with their boats and vessels, and the United States with her navies. The franchise of a ferry does not confer or enlarge, take away or impair the right of navigation. 15 Pickering, 253. A ferry must include the right to land. Tomlin's Law Dictionary, "Ferry;" 7 Grattan's Va. Rep., 212; *Peter* vs. *Kendall*, (6 Barn. & Cress, 301.) It is not necessary for the grantee of a ferry to own the land on both sides of the water. *People* vs. *Babcock*, (11 Wend., 587;) 15 Pickering, 254; 7th Grattan, 212; 6th Barn. & Cress., 302. So far from it, ferries between New York and New Jersey, and between New Jersey and Pennsylvania, have existed from a remote period. Indiana, Ohio, Kentucky, Illinois, Missouri, and Iowa have established ferries over the Ohio and Mississippi rivers from their respective shores, without question of right, and for a long period. *Chosen Freeholders of Hudson Co.* vs. *State*, (4 Zabriskie, 723;) 10th Barbour, 237-8; *Bowman's Devisees & Burnley* vs. *Wathen et al.*, (2 McLean, 377;) *Cincinnati* vs. *White's Lessee*, (6 Peters, 431;) *Walker* vs. *Taylor*, (5 How., 64;) *Miles* vs. *St. Clair Co.*, (8 How., 569;) *Fanning* vs. *Gregoire*, (16 How., 524;) *Phelps* vs. *Bloomington*, (1st Iowa (Green) R., 498.)

Where a State grants lands, it may impose restrictions, which shall be deemed proper, on the grantee; but where the grant is without restrictions the grantee holds the land and all the appurtenances which belong to it.

Some of the rights which appertain to the soil are of a public nature, and the uses of them are, consequently, subjects of legal control. Ferriage and wharfage belong to this class.

That these and kindred subjects of purely internal police were not, and could not have been, by the Constitution of the United States, committed to the exclusive jurisdiction of Congress, seems evident from the impossibility which would attend the regulation of such subjects by the Federal Government.

There are twenty-seven counties on the Ohio and Mississippi rivers in Kentucky, containing, perhaps, 300 ferries. They are judicial and legislative grants, within prescribed distances, to

the grantees of the soil. The statutes regulating them impose certain conditions, and exact of the grantees proper accommodations, skilful ferrymen, and safe boats and good landings. Bond and security are required of the grantees for a compliance with all the requisitions of the statute. And for this the State grants exclusive licenses, and regulates the rates of ferriage.

It is essential to the public accommodation of the citizens of Kentucky that these ferries and their landings should be constantly kept up. It is essential to the intercourse between the States. How could the Federal Government establish or undertake any system for the establishment or regulation of these ferries and landings? How could Congress know anything of the wants of a ferry in the various counties in Kentucky, bordering on the two rivers, for a distance of eight hundred miles? How can the Federal Government exercise jurisdiction over the landings without acquiring title to the soil?.

If, however, these ferries, thus granted upon Kentucky soil, by the sovereign power of the Commonwealth, are regulations of commerce, and, as such, wholly within the power of Congress, the jurisdiction of the General Government must be extended and become equally exclusive over all the landings and wharves within the States from which these ferries are established.

All State laws establishing and regulating ferries, wharves, and public landings, within their own territorial limits, become direct usurpations upon the exclusive power of Congress to regulate commerce, and it follows that the admitted, constantly exercised, exclusive power of the States to develop their internal resources, control their roads and public rivers, protect their fisheries, establish health and inspection laws, in a word, to guard and protect the rights, property, and happiness of its people, perish under the construction which erects this colossus of consolidation upon the reserved rights of the States.

This argument, that would include ferries within the exclusive jurisdiction of Congress rather than within the police powers of the States, rests on the fallacy that all navigation is commerce.

Commerce may, and does under certain circumstances, include navigation, and navigation is certainly one of the means by which commerce is carried on.

It may be conceded, too, that the power to regulate navigation is the power to prescribe rules in conformity with which navigation must be carried on. It extends to the persons who conduct it as well as to the instruments used. 12 Howard, 315-16.

It was the traffic and intercourse with foreign nations among the States and with the Indian tribes which was comprehended by the word commerce as used in the Constitution. This construction is supported because it is essential to reconcile and maintain harmony in leading and well established decisions of this court. *City of New York* vs. *Miln,* (11 Peters, 131;) *Gibbons* vs. *Ogden,* (9 Wheat., 1;) *Brown* vs. *State of Maryland,* (12 Wheat., 419;) *License Cases,* (5 How., 589; *ib.,* 627-8;) *Holmes* vs. *Jennison,* (14 Peters, 614.)

The Federal Government could exercise no jurisdiction over ferries, because "the power to regulate commerce," if exclusive, confers upon Congress no power to regulate the "wharf or common" at Newport from which this ferry is granted. *New Orleans* vs. *U. S.,* (10 Peters, 736;) *Corfield* vs. *Coryell,* (4 Wash. C. R., 379.) It has been expressly decided that whatever soil below low-water mark is the subject of exclusive ownership belongs to the State on whose maritime border and within whose territory it lies, subject to any lawful grants of that soil by the State, or the sovereign power which governed its territory before the Declaration of Independence. *Den* vs. *Jersey Co.,* (15 How., 212;) *Martin* vs. *Waddell,* (16 Pet., 367;) *Pollard's Lessees* vs. *Hagan,* (3 How., 212.)

And this doctrine applies with greater force to the Ohio river, which was owned entirely by Virginia, and is still held by Virginia and Kentucky within their territorial limits, subject to the limitation before referred to.

But it is held by the State not only in subordination to, but in trust for, the enjoyment of certain public rights, among which the right of taking fish and of establishing ferries, building wharves, &c. The Commonwealth holds the property

of this soil for the conservation of these public rights of ferriage, fishery, &c., and, under its reserved rights, may regulate the same. From the ownership and legislative power of the State over it, not less than from its duty to preserve unimpaired the public uses and private rights in which it is held, it may legally do any act or forbid any act which would render the right less valuable, tend to its destruction, or prevent its enjoyment. Vattel, Book I, Ch. 20, § 246; *Corfield* vs. *Coryell*, (4 Wash. C. R., 376;) *Smith* vs. *State of Maryland*, (18 Howard, S. C. R., 75.)

The *jus publicum* of navigation and free intercourse cannot limit the *jus privatum* which a State has in the soil covered by its waters, including fish of all descriptions, and its right to its shores. *Smith* vs. *State of Maryland*, (18 Howard, 74;) *Corfield* vs. *Coryell*, (4 Wash. C. R., 379–80.)

It has been expressly held that the reserved right of the States to establish and regulate ferries upon the waters separating them from other States is not inconsistent with the power on the part of Congress to regulate commerce. *Babcock* vs. *State*, (11 Wend., 590;) *Fanning* vs. *Gregoire*, (16 How., 534.)

If the establishment and regulation of ferries upon the Ohio and Mississippi rivers be not within the reserved rights of the States, still, as such statutes are clearly essential to preserve the peace and protect the public and private interests within the limits of such States, this court would uphold and maintain these laws as the exercise of a concurrent power on the part of the State, till the General Government found it expedient to legislate, or until it became apparent that such State action was in direct conflict with the acts of Congress upon the same subject-matter. *Sturges* vs. *Crowningshield*, (4 Wheat., 196;) *Wilson* vs. *The Black Bird Creek Marsh Co.*, (2 Peters, 245;) *Prigg* vs. *Pennsylvania*, (16 Peters, 539;) *New York* vs. *Milne*, (11 Peters, 103;) *Holmes* vs. *Jennison*, (14 Peters, 540;) 15 Peters, 589.

It is now well settled that steam ferry-boats are not within the provision of the acts of 1793 for the enrolment and licensing of vessels, or of the act of 1838. *The United States* vs. *Steam Ferry Boat "Wm. Pope,"* (Newberry's Admiralty Rep.,

256;) *The Steamboat James Morrison,* (ib., 241;) "*Ottawa,*" (1 Newberry, 536.)

If the act of 18th February, 1793, for enrolling and licensing vessels, or the two acts amendatory thereto, passed 7th July, 1838, (5 Stat. at Large, 304,) and 30th August, 1852, do not include ferries and steam ferry-boats, then, whatever the extent of Federal power, as there has been no legislation by Congress upon the subject, it follows, no conflict arises between Federal and State jurisdiction, and the ferry statute of Kentucky will be upheld.

Many of the State laws regulating vessels in ports and harbors, appointing harbor-masters, erecting wharves, regulating cargoes and ballast, places of anchorage, prescribing rules for the navigation of our largest rivers and lakes, are strong illustrations of the concurrent power of the States with the General Government, even in matters of commerce, until there is a direct antagonism. *Cooley* vs. *The Board of Wardens of Philadelphia,* (12 Howard, 311;) *The "John Gray"* vs. *The "James Frazer,"* (21 Howard, 184;) *Fitch* vs. *Livingston,* (4 Sandford, 493;) 1 Parker, C. C. R., 659; *Groves* vs. *Slaughter,* (15 Peters, 509–574;) *Corfield* vs. *Coryell,* (4 Wash. C. C. R., 371;) *Holmes* vs. *Jennison,* (14 Peters, 594;) 18 Connecticut Rep., 500.

State laws have always been upheld by this court, except in cases where they were in conflict, or were adjudged by the court to be in conflict, with the act of Congress. *Sennot et al.* vs. *Davenport,* (22 How., 244;) 2 Woodberry's Writings, 221; Woodberry & Minot, R., 401–451; 12 Wheaton, 441; 3 Howard, 230; *Milnor* vs. *Railroad Company,* (6 Am. L. R., 9.)

James Taylor, as the owner and patentee in 1787 of the land on which the town of Newport was located, became vested with all the riparian rights of fishery, of ferry, &c. The State could not directly or indirectly divest him of any one of these rights, except by a constitutional exercise of the power of eminent domain. *Bowman & Burnley* vs. *Walker,* (2 McLean, 382;) *Thurman* vs. *Morrison,* (14 Ben. Mon., 367.) Being thus seized of the land and all its riparian rights, he entered into a contract with the State, by which he surrendered one hundred and eighty acres of this ground for the town, and the Legislature

ratified his reservation of all other rights, especially an exclusive right of ferry from the entire space in front of Newport. 6 J. J. Marshall, 134.

After this contract was ratified, it was beyond the control of the State or Federal Government. *Walker* vs. *Taylor,* (5 How., 64;) 10 Peters, 662; 2 McLean, 382; 6 Wheaton, 579.

This franchise of a ferry extended to the entire esplanade in front of said town, and has been run by Taylor, as grantee of the patentee and proprietor, since 1799, subject to the conditions which the ferry laws impose. He may be required to run one or more boats, but his right to the entire franchise extends to every part of this wharf or esplanade. 6 J. J. Marshall, 134; 11 Ben. Monroe, 361; 16 Ben. Monroe, 699.

All the right of wharfage has been decided to be in the city of Newport; it is held in express servitude to his superior and exclusive right of ferry.

The city of Newport can grant no greater title than it possesses; consequently, can neither lease nor convey any part of this public esplanade for the purpose of injuring or lessening the superior claim of Taylor to the exclusive ferry franchise, from every part of the public esplanade.

This right is upheld and preserved by the Federal and State constitutions. It has been sanctioned by the Legislature and the courts of Kentucky, as vested and exclusive.

This court will follow the decision of the court below, if the franchise of ferry, and laws regulating and establishing it, are not, as we have attempted to show, in no manner inconsistent with the Constitution or laws of the United States.

Mr. Justice SWAYNE. The appellees filed their bill in equity in the Circuit Court of Campbell county, Kentucky, seeking thereby to enjoin the appellants from invading the ferry rights claimed by them as set forth in their bill, and also praying for an account and a decree against the appellants in respect of the moneys received by them in violation of the alleged rights of the complainants. The appellants answered, proofs were taken, and the case brought to hearing.

The Circuit Court of Campbell county entered a decree

against the appellants. They removed the cause to the Court of Appeals of Kentucky. That court modified the decree of the court below, but also decreed against them. They thereupon brought the cause to this court by a writ of error under the 25th section of the judiciary act of 1789. It is now presented here for adjudication.

The case made by the pleadings and proofs is substantially as follows:

On the 29th of April, 1787, James Taylor, of Virginia, received from that State a patent for 1,500 acres of land lying upon the Ohio and Licking rivers, at the confluence of those streams, and above the mouth of the latter.

In 1792, James Taylor, the patentee, by his agent, Hubbard Taylor, laid out the town of Newport, at the confluence of the two rivers, upon a part of the tract of fifteen hundred acres.

According to the map of the town as surveyed and thus laid out, the lots and streets did not extend to either of the rivers. A strip of land extending to the water-line was left between the street, running parallel with and nearest to each river.

In July, 1793, John Bartle applied to the Mason county court for the grant of a ferry from his lot in Newport, on Front street, across the Ohio to Cincinnati. An order was made accordingly, but the appellate court of Kentucky reversed and revoked it on the 15th of May, 1798, upon the ground that it did not appear that his lot extended to the Ohio river.

On the 29th of January, 1794, a ferry was granted to James Taylor, of Virginia, by the Mason county court, from his landing in front of Newport, across the Ohio river, with authority to receive the same fares which were allowed upon transportation from the *opposite shore.* A ferry across the Licking was also granted to him.

On the 20th August, 1795, a re-survey and plat of the town of Newport was made, by which the eastern limits of the town were extended to "Eastern Row," and the strip of ground between the Ohio river and the northern boundary of the town, and between Licking river and the western boundary of the town, were endorsed, "Common or *esplanade,* to remain common forever." This plat was made by Roberts.

On the 14th December, 1795, an act was passed by the Legislature of Kentucky incorporating the town of Newport, in conformity with the re-survey and plat of Roberts.

The preamble, and so much of the act as is deemed material in this case, are as follows: " Whereas it is represented to the present General Assembly, that one hundred and eighty acres of land, the property of James Taylor, in the county of Campbell, have been laid off into convenient lots and streets, by the said James Taylor, for the purpose of a town, and distinguished by the name of Newport, and it is judged expedient to vest the said land in trustees and establish the town:

"§ 1. *Be it therefore enacted by the General Assembly,* That the *land comprehending the said town,* agreeably to a plat made by John Roberts, be vested in Thomas Kennedy and others, 'who are hereby appointed trustees for the same, except such parts as are hereafter excepted.'

"§ 7. *Be it further enacted,* That such part of said town as lies between the lots and rivers Ohio and Licking, as will appear by a reference to the said plat, shall forever remain for the use and benefit of said town for a common, *reserving to the said James Taylor, and his heirs and assigns, every advantage and privilege which he has not disposed of, or which he would by law be entitled to.*"

The streets and lots exhibited by the Roberts's plat of 1795, as by that of 1792, did not extend to either the Ohio or Licking river.

The disputed ground between the northern boundary of Front street and the Ohio river varies in width according to the inflexions in the line bounding the margin of the river at high-water mark, from five to ten poles; and the distance from high to low-water mark varies from seventeen to two hundred yards, and was not included in the 180 acres laid out for the town. This area is denominated "the esplanade."

In 1799, James Taylor, of Virginia, the patentee, conveyed to his son, James Taylor, of Kentucky, this strip of ground, between Front street and the Ohio river, together with the other land adjacent to the 180 acres laid out in the plat of the town in 1795, and also the ferry franchise.

James Taylor, of Kentucky, from the time of the conveyance by his father to him, in 1799, continued to run the ferry from the ground in front of Newport, on which it was originally established.

In consequence of the passage of the act of 1806, by the Legislature of Kentucky, concerning ferries, James Taylor, of Kentucky, applied to the Campbell county court in 1807 for the establishment of the ferry granted to his father; and the ferry was re-established in his name, and he executed a bond, and continued to run the ferry from almost every part of the ground or esplanade, in front of the town of Newport, from that period to the time of the filing of the bill in this case.

In 1830 the town of Newport applied to the Campbell county court for the grant to said town of a ferry, from the esplanade across the Ohio river to Cincinnati, which application was refused. An appeal was taken to the Court of Appeals, and at the June term, 1831, the order of the Campbell county court was affirmed.

This case is reported in 6 J. J. Marshall, 134.

James Taylor, of Virginia, and his grantee and son, James Taylor, of Kentucky, continued, therefore, uninterruptedly to run this ferry from 1794 until the commencement of this sui . The proof shows, also, that he constantly exercised acts of ownership over the whole common in front of Newport, and did not permit even the quarrying of stone without his consent; that he was in the habit of landing his ferry-boats at various points on this common or esplanade from time to time, and that he acquiesced in its free use as a common for egress and ingress by the people of the town, but always claimed and exercised the exclusive ferry privilege.

"After the incorporation of the town of Newport as a city, the city of Newport applied, in 1850, at the February term of the Campbell county court, for the grant of a ferry across the Ohio river, to the president and Common Council of the city of Newport. No notice was given of the application, and the ferry was granted."

At the time of this application, James Taylor, of Kentucky,

had departed this life, leaving a will, and appointing his son, James Taylor, his executor, and making a particular devise of this ferry, and requiring his executor to rent it until the taking effect of the devise, as provided in the will.

As soon as the action of the Campbell county court granting a ferry to the city of Newport was known, a writ of error was sued out from the *Circuit Court* by the executor and devisees of James Taylor, of Kentucky, to reverse the order of the *county court*, whereby the ferry was granted. The order was reversed. The city of Newport took the case to the Court of Appeals of Kentucky. That court, in March, 1850, affirmed the judgment of the Circuit Court. This case is reported in 11 Ben. Monroe, 361.

It appears in the proofs, that the ferry boats-used by the appellees were duly enrolled, inspected, and licensed under the laws of the United States.

No claim is set up in the bill as to any ferry license from Ohio, or to any right of landing on the Ohio side.

In 1853 the appellants built the steamer Commodore, and constituted themselves "The Cincinnati and Newport Packet Company," for the purpose of running that steamer as a ferry-boat from Cincinnati to Newport, and from Newport to Cincinnati. They rented, for five years, a portion of the esplanade in front of Monmouth street, *in the city of Newport*, from the Common Council of that city.

The Commodore was a vessel of 128 tons burden, and in all respects well appointed and equipped.

The appellants caused her to be enrolled on the 4th of January, 1854, at the custom-house at Cincinnati, under the act of Congress for enrolling and licensing vessels to be employed in the coasting trade and fisheries, with Peter Conway as master, and obtained on the same day, from the surveyor of customs at the port of Cincinnati, a license for the employment and carrying of the coasting trade.

They commenced running her as a ferry-boat from Cincinnati to Newport, and from Newport to Cincinnati, on the 5th of January, 1854.

Her landings were at the wharves on each side of the river, opposite to each other, the landing in Newport being at the foot of Monmouth street.

The right of the Commodore to land there, for all lawful purposes, was not contested in the Court of Appeals, and was not questioned in the argument here.

In January, 1854, the appellees exhibited their bill in equity against the appellants.

In the same month a preliminary injunction was granted, restraining the appellants from running the Commodore as a ferry-boat between the cities of Cincinnati and Newport.

In the progress of the cause, proceedings were instituted against the appellants for contempt of the court in violating this injunction. It was then made to appear that the appellants had, on the 6th of March, 1854, obtained a ferry license under the laws of Ohio. This fact appears in the record, and is adverted to in the judgment of the Court of Appeals.

Upon the final hearing, the Campbell Circuit Court decreed, that an account should be taken of the ferriages received by the appellants on account of the Commodore, and that they " be and they are, each and all of them, perpetually enjoined from landing the boat called in the pleadings and proof the 'Commodore,' or any other boat or vessel, upon that part of the Kentucky shore of the Ohio river lying between the lots of the city of Newport and the Ohio river, designated upon the plat of the town of Newport as the 'esplanade,' and including the whole open space so designated, for the purpose of receiving or landing either persons or property *ferried from, or to be ferried to, the opposite shore of the Ohio river.*

" It being hereby adjudged against all the defendants to this action, that the entire privilege and franchise of ferrying persons and property to and from said part of the Kentucky shore of the Ohio river is in the plaintiffs alone; and it is hereby adjudged, that the receiving of persons, animals, carriages, wagons, carts, drays, or any other kind of vehicle, either loaded or empty, upon said boat or any other vessel at said part of the Kentucky shore, for the purpose of being transported and landed upon the opposite shore of the Ohio river, and

the landing of persons, animals,. and the kind of property above described, which had been received upon said boat or other vessel at or from the opposite shore of the Ohio river, and transported across said river, upon said part of the Kentucky shore, is an infringement of the ferry franchise of the plaintiffs, and is hereby perpetually enjoined; and this injunction shall extend to and embrace all persons claiming under the defendants to this action.''

In reviewing this adjudication, the Court of Appeals held: ''The judgment is erroneous in the extent to which it perpetuates the injunction, and to which it restrains the Commodore and the defendants in landing upon the slip in question, persons and property transported from the Ohio shore, and in adjudging, as it seems to do, the exclusive right of ferrying from both sides of the river to be in plaintiffs alone. *The transportation as carried on* was illegal and properly enjoined, and the injunction should have been perpetuated against future *transportation of a like kind*, either under color of any license obtained, or to be obtained, from the authorities of the United States under the existing laws, or without such license, unless authorized to transport from the Ohio shore, from a ferry established on that side under the laws of that State; and they might have been restrained or prohibited, under all or any circumstances, from transporting persons or property from this to the other side, (within the interdicted distance above or below an established ferry on this side,) unless authorized under the laws of this State to do so; and the exclusive right of ferrying from the Kentucky side should have been declared to be in the plaintiffs.

''Wherefore the judgment perpetuating said injunction, and adjudging the exclusive right of ferrying from both sides of the river to be in the plaintiffs, is reversed, and the cause as to that is remanded, with directions to perpetuate the injunction to the extent just indicated, and to adjudge the right as above directed.

''And afterwards, to wit, on the 9th day of February, 1860, the following order was entered on the records of this court:

''*City of Newport* vs. *Taylor's Executors et al.* Judge *Campbell.*

"It is ordered that the mandate be amended as follows: That the judgment perpetuating the said injunction is *reversed*, and the cause as to that is remanded, with directions to perpetuate the injunction to the extent just indicated, and to adjudge the right, as above directed."

It is objected by the appellants, that no such ferry franchise exists as was sought to be protected by this decree, because it was granted under the laws of Kentucky, and did not embrace a landing on the Ohio shore. It is insisted that such a franchise, when confined to one shore, is a nullity, and that the concurrent action of both States is necessary to give it validity.

Under the laws of Kentucky a ferry franchise is grantable only to riparian owners. The franchise in this instance was granted in pursuance of those laws. Any riparian ownership, or right of landing, or legal sanction of any kind beyond the jurisdiction of that State, is not required by her laws.

The riparian rights of James Taylor, deceased, and of his executor and devisees, in respect of the Kentucky shore, have been held sufficient to sustain a ferry license by the highest legal tribunal of that State, whenever the subject has been presented. The question came under consideration, and was discussed and decided in the year 1831 in 6 J. J. Marshall, 134, *Trustees of Newport* vs. *James Taylor;* in 1850 in Ben. Monroe, 361, *City of Newport* vs. *Taylor's heirs;* in 1855 in this case, 16 Ben. Monroe, 784; and, finally, in 1858, in the *City of Newport* vs. *Air & Wallace.* (Pamphlet copy of Record.)

These adjudications constitute a rule of property, and a rule of decision which this court is bound to recognise. Were the question an open one, and now presented for the first time for determination, we should have no hesitation in coming to the same conclusion. We do not see how it could have been decided otherwise. This point was not pressed by the counsel for the appellants. The judgments referred to exhaust the subject. We deem it unnecessary to go again over the same ground.

The concurrent action of the two States was not necessary. "A ferry is in respect of the landing place, and not of the

water. The water may be to one, and the ferry to another." 13 Viner's Ab., 208, A.

In 11 Wend., 590, *The People* vs. *Babcock*, this same objection was urged, in respect of a license under the laws of New York, for a ferry across the Niagara river. The court said: "The privilege of the license may not be as valuable to the grantee, by not extending across the river; but as far as it does extend, he is entitled to all the provisions of the law, the object of which is to secure the exclusive privilege of maintaining a ferry at a designated place."

The point has been ruled in the same way in a large number of other cases:

2 McLean, 377, *Bowman's Devisees and others* vs. *Burnley and others;* 3 Yerger, 390, *Memphis* vs. *Overton*; 1 Green's Iowa Rep., 498, *Phelps* vs. *Bloomington;* 4 Zabriskie, 723, *Freeholders* vs. *The State;* 8 How., 569, *Wills et al.* vs. *St. Clair County et al.;* 16 How., 564, *Fanning* vs. *Gregoire.*

In the case last cited, (*Fanning* vs. *Gregoire*, 16 How., 564,) the arguments on file show that this objection was pressed with learning and ability. In the opinion delivered, the court seems to have assumed the validity of such a license, without in terms adverting to the question. Another question was fully discussed and expressly decided. This point does not appear in the report of the case.

Our attention has been earnestly invited to the following provisions of the ferry laws of Kentucky, under which the license of the appellees was granted:

"None but a resident of Kentucky can hold the grant of a ferry. Sec. 5, Stanton's Revised Statutes, p. 540.

"Any sale or leasing of a ferry right, or contract not to use it, made with the owner of a ferry established on the other side of the Ohio or Mississippi, shall be deemed an abandonment, for which the right shall be revoked. Sec. 12.

"Any one who shall, for reward, transport any person or thing across a water-course from or to any point within one mile of an established ferry, unless it be the owner of an established ferry on the other side of the Ohio and Mississippi

rivers so transporting to such point on this side, and any owner or lessee, or servant, of the owner of a ferry on the other side of either of those rivers, who shall so transport from this side, without reward, shall forfeit and pay to the owner of the nearest ferry the sum of sixteen dollars for every such offence, recoverable before a justice of the peace. Sec. 14.

"No ferry shall be established on the Ohio river within less than a mile and a half, nor upon any other stream within less than a mile of the place in a straight line, where any existing ferry was pre-established, unless it be a town or city, or where an impassable stream intervenes.

"No new ferry shall be so granted within a city or town, unless those established therein cannot properly do all the business, or unless public convenience greatly requires a new ferry at a site not within four hundred yards of that of any other." Sec. 15.

We have considered these in connection with the other provisions of those laws. Whether they are wise and liberal, or the opposite, are inquiries that lie beyond the sphere of our powers and duties.

Considered all together, they have not seemed to us to deserve the character which has been ascribed to them. While they fence about with stringent safeguards the rights of the holder of the ferry franchise, they do not leave unprotected the rights of the public. If they give the franchise only to the riparian owner and citizen of the State, they surround him with sanctions designed to secure the fulfilment of his obligations.

The franchise is confined to the transit from the shore of the State. The same rights which she claims for herself she concedes to others. She has thrown no obstacle in the way of the transit from the States lying upon the other side of the Ohio and Mississippi. She has left that to be wholly regulated by their ferry laws. We have heard of no hostile legislation, and of no complaints, by any of those States. It was shown in the argument at bar that similar laws exist in most, if not all, the States bordering upon those streams. They exist in other States of the Union bounded by navigable waters.

Very few adjudged cases have been brought to our notice in which the ferry rights they authorize to be granted have been challenged; none in which they have been held to be invalid.

A ferry franchise is as much property as a rent or any other incorporeal hereditament, or chattels, or realty. It is clothed with the same sanctity and entitled to the same protection as other property.

"An estate in such a franchise and an estate in land rest upon the same principle." 3 Kent's Com., 459.

Lastly, it is urged that the Commodore, having been enrolled under the laws of the United States, and licensed under those laws for the coasting trade, the decree violates the rights which the enrolment and license gave to the appellants in respect of that trade by obstructing the free navigation of the Ohio.

Here it is necessary to consider the extent of the injunction which the decree directs to be entered by the court below.

The counsel for the appellants insists that, " as respects transportation from the Kentucky side, and from the Commodore's wharf at the foot of Monmouth street, that vessel is enjoined, under '*all or any circumstances, from transporting persons or property*' to the opposite shore, unless under the authority of the State of Kentucky."

We do not so understand the decree. If we did, we should, without hesitation, reverse it. An examination of the context leaves no doubt, in our minds, that the court intended only to enjoin the Commodore, under "all or any circumstances, from transporting persons or property" from the Kentucky shore *in violation of the ferry rights of the appellees*, which it was the purpose of the decree to protect. The bill made no case, and asked nothing, beyond this. The court could not have intended to go beyond the case before it. That the appellants had the right after as before the injunction, in the prosecution of the carrying and coasting trade, and of ordinary commercial navigation, to transport "persons and property" from the Kentucky shore, no one, we apprehend, will deny. The limitation is the line which protects the ferry rights of the appellees.

Those rights give them no monopoly, under "all circumstances," of all commercial transportation from the Kentucky shore. They have no right to exclude or restrain those there prosecuting the business of commerce in good faith, without the regularity or purposes of ferry trips, and seeking in nowise to interfere with the enjoyment of their franchise. To suppose that the Court of Appeals, in the language referred to, intended to lay down the converse of these propositions, would do that distinguished tribunal gross injustice.

The Commodore was run openly and avowedly as a ferryboat; that was her business. The injunction as to her and her business was correct.

The language of the court must be considered as limited to that subject. The zeal with which this point was pressed by the counsel for the appellants has led us thus fully to consider it.

The enrolment of the Commodore ascertained her ownership, and gave her a national character.

The license gave her authority to carry on the coasting trade. Together they put the appellants in a position to make the question here to be considered.

The language of the Constitution to which this objection refers is as follows: "The Congress shall have power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes." Art. 1, § 8, clause 4.

The character and extent of the power thus conferred, and the boundaries which separate that power from the powers of the States touching the same subject, came under discussion in this court, for the first time, in *Gibbons* vs. *Ogden*, (9 Wheat., 1.) It was argued on both sides with exhaustive learning and ability. The judgment of the court was delivered by Chief Justice Marshall. The court said: "They" (State inspection laws) "form a portion of the immense mass of legislation which embraces everything within the territory of a State *not surrendered to the General Government;* all which can be most advantageously exercised by the States themselves. Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, and

those which respect turnpike roads, *ferries*, &c., are parts of this mass.".

The proposition thus laid down has not since been questioned in any adjudicated case.

The same principle has been repeatedly affirmed in other cases, both in this and the State courts.

In *Fanning* vs. *Gregoire*, (9 How., 534,) before referred to, this court held:

"The argument that the free navigation of the Mississippi, guarantied by the ordinance of 1787, or any right which may be supposed to arise from the exercise of the commercial power of Congress, does not apply in this case. Neither of these interfere with *the police powers of a State* in granting ferry licenses. When navigable rivers within the commercial powers of the Union may be obstructed, one or both of these powers may be invoked."

Rights of commerce give no authority to their possessor to invade the rights of property. He cannot use a bridge, a canal, or a railroad without paying the fixed rate of compensation. He cannot use a warehouse or vehicle of transportation belonging to another without the owner's consent. No more can he invade the ferry franchise of another without authority from the holder. The vitality of such a franchise lies in its exclusiveness. The moment the right becomes common, the franchise ceases to exist.

We have shown that it is property, and, as such, rests upon the same principle which lies at the foundation of all other property.

Undoubtedly, the States, in conferring ferry rights, may pass laws so infringing the commercial power of the nation that it would be the duty of this court to annul or control them. 18 How., 519, *Wheeling Bridge* case. The function is one of extreme delicacy, and only to be performed where the infraction is clear. The ferry laws in question in this case are not of that character. We find nothing in them transcending the legitimate exercise of the legislative power of the State.

The authorities referred to must be considered as putting the question at rest. The ordinance of 1787 was not particu-

*Conway et al.* vs. *Taylor's Executor.*

larly brought to our attention in the discussion at bar.   Any argument drawn from that source is sufficiently met by what has been already said.

The counsel for the appellees has invoked the authority of *Cooley* vs. *The Board of Wardens of Philadelphia,* (12 How., 299,) in which a majority of this court held that, upon certain subjects affecting commerce as placed under the guardianship of the Constitution of the United States, the States may pass laws which will be operative till Congress shall see fit to annul them.

In the view we have taken of this case, we have found it unnecessary to consider that subject.

There has been now nearly three-quarters of a century of practical interpretation of the Constitution.   During all that time, as before the Constitution had its birth, the States have exercised the power to establish and regulate ferries; Congress never.   We have sought in vain for any act of Congress which involves the exercise of this power.

That the authority lies within the scope of " that immense mass " of undelegated powers which " are reserved to the States respectively," we think too clear to admit of doubt.

We place our judgment wholly upon that ground.

*There is no error in the decree of the Court of Appeals.   It is therefore affirmed, with costs.*