**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ELIZABETH FLYNT; HAIG KELEGIAN, Sr.; HAIG T. KELEGIAN, Jr., | No. 22-16376 |
| | D.C. No. 2:16-cv-02831-JAM-JDP |
| *Plaintiffs-Appellants*, | |
| v. | OPINION |
| ROB BONTA, in his official capacity as Attorney General of the State of California; YOLANDA MORROW; PAULA D. LABRIE; ERIC C. HEINS; EDWARD YEE; CATHLEEN GALGIANI; WILLIAM LIU, in their official capacity as Commissioners of the California Gambling Control Commission, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted August 22, 2024
San Francisco, California

Filed March 14, 2025

Before:  Daniel A. Bress and Lawrence VanDyke, Circuit
Judges, and Robert S. Lasnik,[*] District Judge.

Opinion by Judge Bress

## SUMMARY[**]

### Commerce Clause

Affirming the district court's judgment for California
officials, the panel held that the cardroom licensing
restrictions set forth in California Business and Professions
Code §§ 19858(a) and 19858.5, which make a person
ineligible for a California cardroom license if he owns more
than a 1% financial interest in a business that engages in
casino-style gambling or if he has control over such a
business, do not violate the dormant Commerce Clause.

The panel first rejected plaintiffs' contention that
§§ 19858(a) and 19858.5 violate the dormant Commerce
Clause because they discriminate against interstate
commerce. The provisions are not facially discriminatory
nor do they have a discriminatory purpose or effect that
favors in-state economic interests. Nothing in the text,
history, or operation of §§ 19858(a) and 19858.5 suggests
discrimination against interstate commerce.

---

[*] The Honorable Robert S. Lasnik, United States District Judge for the
Western District of Washington, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

The panel next rejected plaintiffs' contention that the statutes are unconstitutional because they impermissibly regulate interstate commerce occurring wholly outside of California, precluding plaintiffs from investing in out-of-state casinos with no connection to the state. Plaintiffs' extraterritoriality theory lacks merit because the statutes do not reach out and purport to regulate wholly out-of-state conduct; they instead condition a state license for conducting in-state activities on plaintiffs foregoing certain business interests, whether within or outside the state.

Finally, the panel rejected plaintiffs' contention that the statutes violate the dormant Commerce Clause by unduly burdening interstate commerce. Plaintiffs failed to demonstrate a significant or substantial burden on interstate commerce.

---

## COUNSEL

Erin M. Paris (argued) and Paul J. Cambria Jr., Lipsitz Green Scime Cambria LLP, Buffalo, New York, for Plaintiffs-Appellants.

Joshua A. Klein (argued), Deputy Solicitor General, Office of the California Attorney General, Oakland, California; James G. Waian, Deputy Attorney General; T. Michelle Laird, Acting Senior Assistant Attorney General; Rob Bonta, California Attorney General; Office of the California Attorney General, San Diego, California; for Defendants-Appellees.

Benjamin J. Horwich and Rowley J. Rice, Munger Tolles & Olson LLP, San Francisco, California, for Amicus Curiae Elevation Entertainment Group.

## OPINION

BRESS, Circuit Judge:

Under California Business and Professions Code §§ 19858(a) and 19858.5, a person is ineligible for a California cardroom license if he owns more than a 1% financial interest in a business that engages in casino-style gambling or if he has control over such a business. We must decide whether this limitation on cardroom licensure violates the dormant Commerce Clause. We hold it does not.

I

The constitutional challenge in this case arises from California's effort to limit gambling, and the influence of unlawful gambling, in the state. With the exception of Indian casinos on tribal lands, California's Constitution provides that "[t]he Legislature has no power to authorize, and shall prohibit, casinos of the type currently operating in Nevada and New Jersey." Cal. Const. art. IV, § 19(e); *see also id.* § 19(f) (exception for tribal gaming). California has otherwise made it a crime to conduct various forms of gambling, including "any banking or percentage game." Cal. Penal Code § 330. In a banked or percentage game, the casino competes in the games as the "house" and profits at the expense of losing players. *See In re Indian Gaming Related Cases*, 331 F.3d 1094, 1097 n.1 (9th Cir. 2003).

California does, however, allow cardrooms. *See* Cal. Bus. & Prof. Code §§ 19800, *et seq.* Cardrooms, or card clubs, have existed in California since the Gold Rush and remain permitted, subject to state regulation. Cardrooms cannot offer banked or casino-style games. *See Flynt v. Shimazu* (*Flynt I*), 940 F.3d 457, 459 (9th Cir. 2019)

(explaining that California law "prohibits cardrooms from engaging in casino-like activities, including blackjack, roulette, and other house-banked or percentage games"). Instead, at cardrooms, "players play against each other and pay the cardroom a fee to use its facilities." *Id.*

California cardroom operators must comply with the state's restrictions on gambling as well as the requirements of the state Gambling Control Act. Cal. Bus. & Prof. Code §§ 19800, *et seq.* Under this regulatory framework, every person who owns, operates, or receives compensation from a cardroom must obtain a license. Cal. Bus. & Prof. Code §§ 19850, 19851, 19855. The California Gambling Control Commission (CGCC) has authority to issue, deny, and revoke licenses. *Id.* §§ 19811, 19823.

Some persons are automatically disqualified from obtaining a cardroom license under California law. As relevant here,

> a person shall be deemed unsuitable to hold a state gambling license to own a gambling establishment if the person, or any partner, officer, director, or shareholder of the person, has any financial interest in any business or organization that is engaged in any form of gambling prohibited by Section 330 of the Penal Code, whether within or without this state.

*Id.* § 19858(a); *see also id.* § 19805(ae) (defining "person" to include corporate entities and partnerships). The reference in § 19858(a) to "Section 330 of the Penal Code" is a reference to California's above-noted criminal prohibition against operating banked and percentage games.

In part because of the growth of tribal casinos, California has considered repealing the § 19858(a) licensing restriction. In 2002, the Governor directed the Little Hoover Commission, an independent state agency, to study the issue. The Commission's report acknowledged that the rationale for § 19858(a) was crime-prevention: keeping "organized crime syndicates" out of California, preventing embezzlement associated with gambling, and protecting "chronic losers" from turning to criminal activity. But the report was generally skeptical of the link between crime and gambling and concluded that "the limitations are no longer necessary to protect the public safety."

Despite the Commission's recommendation, the California Legislature declined to repeal § 19858(a). Instead, in 2007, the Legislature enacted a limited exception to § 19858(a), under which the CGCC may

> deem an applicant or licensee suitable to hold a state gambling license even if the applicant or licensee has a financial interest in another business that conducts lawful gambling outside the state that, if conducted within California, would be unlawful, provided that an applicant or licensee may not own, either directly or indirectly, more than a 1 percent interest in, or have control of, that business.

Cal. Bus. & Prof. Code § 19858.5. Combining this exception with the general prohibition in § 19858(a), the "upshot" under California law is "that a licensee of a California cardroom may not own more than a one-percent interest in any out-of-state entity that engages in casino-style

gambling activities, even if such activities are lawful where the entity operates." *Flynt I*, 940 F.3d at 460.

Plaintiffs Elizabeth Flynt, Haig Kelegian, Sr., and Haig Kelegian, Jr. are California residents and cardroom operators. They are pursuing this lawsuit against the Attorney General of California, the Director of the Bureau of Gambling Control, and the Commissioners of the CGCC, claiming that §§ 19858(a) and 19858.5 violate the dormant Commerce Clause. *See Flynt I*, 940 F.3d at 460. The district court initially dismissed the complaint as untimely, but we reversed that ruling in *Flynt I*. *Id.* at 464. On remand, the district court rejected plaintiffs' various dormant Commerce Clause theories in several well-considered decisions.

Plaintiffs appeal for a second time. Our review is de novo. *See Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1322 (9th Cir. 2015) (en banc).

## II

The Constitution grants Congress the power to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. From this affirmative grant of authority to Congress, the Supreme Court has inferred a limitation on the states. Under Supreme Court precedent, the Commerce Clause "'contains a further, negative command,' one effectively forbidding the enforcement of 'certain state economic regulations even when Congress has failed to legislate on the subject." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 368 (2023) (brackets omitted) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)). This implied mandate restricts states' ability to restrain the free exchange of goods and services in an interstate market. *See, e.g.*, *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019); *Great Atl. &*

*Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 370 (1976). Although it is not a clause in the Constitution, this limitation on the states has come to be known as the dormant Commerce Clause. *See Pork Producers*, 598 U.S. at 368; *Sam Francis*, 784 F.3d at 1323.

As a judge-made and enforced doctrine, the strictures of the dormant Commerce Clause have ebbed and flowed over time through case law, with the Supreme Court refining the doctrine's proper scope. *See South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 172 (2018) ("[T]his Court has observed that 'in general Congress has left it to the courts to formulate the rules' to preserve 'the free flow of interstate commerce.'") (quoting *S. Pac. Co. v. Ariz. ex rel. Sullivan*, 325 U.S. 761, 770 (1945)). In recent years, three key strands of dormant Commerce Clause jurisprudence have emerged that are relevant to this case.

First, "state regulations may not discriminate against interstate commerce." *Id.* at 173. This non-discrimination principle has long been considered significant in this area of law, but the Supreme Court's recent decision in *Pork Producers* reaffirmed that "[t]oday, this antidiscrimination principle lies at the 'very core' of our dormant Commerce Clause jurisprudence." 598 U.S. at 369 (quoting *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997)). Under this reading, the dormant Commerce Clause principally "prohibits the enforcement of state laws 'driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Id.* (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008)).

State laws that discriminate in this manner "face 'a virtually *per se* rule of invalidity.'" *Wayfair*, 585 U.S. at 173 (quoting *Granholm v. Heald*, 544 U.S. 460, 476 (2005)). Thus, "if a state law discriminates against out-of-state goods or nonresident economic actors, the law can be sustained only on a showing that it is narrowly tailored to 'advance a legitimate local purpose.'" *Tenn. Wine & Spirits Retailers Ass'n*, 588 U.S. at 518 (quoting *Davis*, 553 U.S. at 338, and citing *Oregon Waste Sys., Inc. v. Dep't of Env'tl Quality of Ore.*, 511 U.S. 93, 100–101 (1994), and *Maine v. Taylor*, 477 U.S. 131, 138 (1986)).

A second line of cases concerns state laws that operate extraterritorially beyond the state's borders. *Pork Producers* substantially clarified this area of dormant Commerce Clause doctrine. In *Pork Producers*, the Supreme Court affirmed our court's dismissal of a dormant Commerce Clause challenge to a California law forbidding the in-state sale of pork from pigs "confined in a cruel manner," a standard defined with reference to certain welfare specifications. 598 U.S. at 365–66 (quoting Cal. Health & Safety Code Ann. § 25990(b)(2)). Invoking an extraterritoriality principle, and relying on the fact that almost all pork eaten in California is shipped in from elsewhere, the challengers in *Pork Producers* contended that Supreme Court case law imposed "an additional and almost *per se* rule forbidding enforcement of state laws that have the practical effect of controlling commerce outside the State, even when those laws do not purposely discriminate against out-of-state economic interests." *Id.* at 367, 371 (quotations omitted). In the challengers' view, California's law was unconstitutional because it would "impose substantial new costs on out-of-state pork producers who wish to sell their products in California." *Id.* at 371.

The Supreme Court rejected this argument. Addressing its past decisions in *Healy v. Beer Institute*, 491 U.S. 324 (1989), *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573 (1986), and *Baldwin v. G. A. F. Seelig, Inc.*, 294 U.S. 511 (1935), the Court explained that these cases "reveal[] nothing like the rule petitioners posit." *Pork Producers*, 598 U.S. at 371. Rather, "each typifies the familiar concern with preventing purposeful discrimination against out-of-state economic interests." *Id.* In each case, "the challenged statutes had a *specific* impermissible 'extraterritorial effect'—they deliberately 'prevented out-of-state firms from undertaking competitive pricing' or 'deprived businesses and consumers in other States of whatever competitive advantages they may possess.'" *Id.* at 374 (quoting *Healy*, 491 U.S. at 338–39) (alterations omitted). Thus, these cases turned on "an impermissible discriminatory purpose," and not on any broader, freestanding extraterritoriality principle. *Id.* at 373; *see also id.* at 394 (Roberts, C.J., concurring in part and dissenting in part) (agreeing on this point).

*Pork Producers* also rejected the proposed extraterritoriality rule based on its unsustainable implications. The rule failed in view of "our interconnected national marketplace," in which "many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior." *Id.* at 374. According to the Supreme Court, petitioners' extraterritoriality theory was untenable because it would "cast a shadow over laws long understood to represent valid exercises of the States' constitutionally reserved powers." *Id.* at 375. Nevertheless, the Court left open the possibility that "a law that *directly* regulated out-of-state transactions by those with *no* connection to the State" could violate the dormant Commerce Clause or some

other constitutional limitation. *Id.* at 375–76 & n.1 (discussing *Edgar v. MITE Corp.*, 457 U.S. 624, 641–43 (1982) (plurality op.)).

Third, under what has been termed "*Pike* balancing," "[s]tate laws that 'regulate even-handedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'" *Wayfair*, 585 U.S. at 173 (alterations omitted) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). This aspect of dormant Commerce Clause doctrine has proven perhaps the most challenging to administer. Most recently, in *Pork Producers*, the Supreme Court reiterated that "'no clear line' separates the *Pike* line of cases from our core antidiscrimination precedents," and that many *Pike* cases, including *Pike* itself, "'turned in whole or in part on the discriminatory character of the challenged state regulations.'" 598 U.S. at 377 (quoting *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 n.12 (1997)); *see also, e.g.*, *Nat'l Ass'n of Optometrists & Opticians v. Harris* (*Optometrists II*), 682 F.3d 1144, 1149 (9th Cir. 2012) ("The cases therefore are not clear or consistent in terms of when a regulation is considered discriminatory and virtually *per se* invalid and when and how a regulation is subjected to *Pike*'s 'clearly excessive' burden test.").

Under *Pike*, a plaintiff must demonstrate that a challenged law imposes a "substantial" or "significant" burden on interstate commerce before *Pike* balancing can occur. *See, e.g.*, *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Bonta* (*Éleveurs II*), 33 F.4th 1107, 1119 (9th Cir. 2022); *Optometrists II*, 682 F.3d at 1156. The Justices in *Pork Producers* likewise agreed that whether a law imposes a substantial burden on interstate commerce is a threshold

inquiry, although given the fractured nature of the Court's decision on the *Pike* question, there is no portion of any opinion on this point that commanded a majority. *See* 598 U.S. at 383 (plurality); *id.* at 393 (Sotomayor, J., concurring) ("Alleging a substantial burden on interstate commerce is a threshold requirement that plaintiffs must satisfy before courts need even engage in *Pike*'s balancing and tailoring analyses."); *id.* at 394 (Barrett, J., concurring) (similar); *id.* at 395 (Roberts, C.J., concurring in part and dissenting in part) (similar).

Under the *Pike* test, if plaintiffs show a substantial burden on interstate commerce, the court proceeds to determine whether that burden is "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. At this stage, and unless the benefits of the state's law are "illusory," courts typically accept the state's articulation of the law's claimed benefits. *See Optometrists II*, 682 F.3d at 1156. Further, courts have sometimes said that state regulations justified on public safety grounds enjoy a "strong presumption of validity." *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 670 (1981) (plurality) (quoting *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 524 (1959)); *see also, e.g.*, *Pharm. Rsch. & Mfrs. of Am. v. Cnty. of Alameda*, 768 F.3d 1037, 1045 (9th Cir. 2014) (same).

### III

Although their arguments bleed together at times, plaintiffs effectively argue that the cardroom licensing restrictions in California Business and Professions Code §§ 19858(a) and 19858.5 violate the dormant Commerce Clause under each of the three theories just outlined: by discriminating against interstate commerce, by controlling out-of-state activities, and by unduly burdening interstate

commerce.  We address each theory in turn, keeping in mind the Supreme Court's clear instruction, repeated in *Pork Producers*, that "'extreme caution' is warranted before a court deploys" its "implied authority" to reject a state law under the dormant Commerce Clause.  598 U.S. at 390 (quoting *Gen. Motors Corp.*, 519 U.S. at 310).

## A

We first consider whether §§ 19858(a) and 19858.5 violate the dormant Commerce Clause because they discriminate against interstate commerce.  They do not: these provisions are not facially discriminatory, nor do they have a discriminatory purpose or effect that favors in-state economic interests.  *See Rocky Mt. Farmers Union v. Corey*, 730 F.3d 1070, 1087 (9th Cir. 2013).

The cardroom licensing restrictions at issue here do not implicate the core concern at the heart of the dormant Commerce Clause: laws that "benefit in-state economic interests by burdening out-of-state competitors."  *Pork Producers*, 598 U.S. at 369 (quoting *Davis*, 553 U.S. at 337–38).  The laws do not "advantage in-state firms or disadvantage out-of-state rivals."  *Id.* at 370.  Sections 19858(a) and 19858.5 apply evenly to Californians and non-Californians alike who own 1% or more of a covered gambling business or who control such a business.  They do not, as plaintiffs suggest, exclude all out-of-state market participants and interstate capital from California's cardroom market.

Nor do §§ 19858(a) and 19858.5 suggest a discriminatory purpose against out-of-state competitors.  Plaintiffs' primary evidence of discriminatory purpose is that § 19858's statutory predecessor permitted the denial of a cardroom license if the applicant "[h]as any financial or

other interest in any business or organization *outside the State of California* which is engaged in any form of gambling or gaming not authorized [in California]." (Emphasis added). Plaintiffs rely on similar language in the Little Hoover Report.

But setting aside that the current version of the statute refers to persons who have financial interests in covered gambling businesses, "whether within or without this state," Cal. Bus. & Prof. Code § 19858(a), the historical language on which plaintiffs rely is consistent with California's asserted interest in regulating gambling and preventing gambling-related crime. The state's desire to prevent crime and gambling-related corruption does not amount to the kind of economic protectionism that would support a finding of discriminatory purpose. *See Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown* (*Optometrists I*), 567 F.3d 521, 525 (9th Cir. 2009) (explaining that a law lacks a discriminatory purpose where the evidence does not "suggest[] that the purpose [of a challenged state law] is to protect California [businesses] from competition from out-of-state interests, as opposed to commercial interests generally"). That is especially so considering that federal law traditionally "respect[s] the policy choices of the people of each State on the controversial issue of gambling." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 484 (2018).

Plaintiffs also have not shown that §§ 19858(a) and 19858.5 create discriminatory effects against out-of-state economic interests. Plaintiffs generally maintain that the statutes "unconstitutionally restrict the flow of interstate capital by erecting a barrier around California's gambling market." To the extent plaintiffs are claiming that out-of-state companies cannot invest in California cardrooms, the

district court concluded that plaintiffs, as California cardroom licensees, lack standing to assert a claim on behalf of non-California casino owners. *Flynt v. Shimazu*, 466 F. Supp. 3d 1102, 1105, 1108 (E.D. Cal. 2020). Plaintiffs did not challenge this determination on appeal and so forfeited the issue. *See, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 989 (9th Cir. 2023).

Regardless, whether premised on out-of-state economic interests or the interests of those within the state who cannot invest in out-of-state gambling businesses, plaintiffs' "interstate capital" theory does not demonstrate an improper discriminatory effect. That is because "there is no discrimination between similarly situated entities" within and outside the state. *Optometrists I*, 567 F.3d at 525. Anyone—whether in-state or out-of-state—is ineligible to obtain a California cardroom license if he maintains more than a 1% interest in, or control over, a covered gambling business. And that is true regardless of whether the gambling enterprise is located outside of California or within it.

Although plaintiffs point out that the casino market in which they would invest is outside the state, that is because California generally does not allow casinos. And nothing in the dormant Commerce Clause would require California to desist from its view that these types of gambling operations are harmful. *See Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003) (noting that the regulation of gambling as a "'vice' activity . . . lies at the heart of a state's police powers"). Plaintiffs concede that California could deny a cardroom license based on an assessment of the applicant's poor character. California here has reached the equivalent judgment based on ownership of more than 1% or control of a gambling business deemed

illegal under state law, without distinguishing between the in- or out-of-state nature of either the cardroom licensee or the gambling business in which the licensee would invest. That there are no (non-Indian) casinos in California does not mean §§ 19858(a) and 19858.5 unlawfully discriminate against interstate commerce. The resulting limit on interstate investment is a function of California's decision not to allow casinos within its state, a judgment to which it is fully entitled.

Plaintiffs' repackaged discrimination argument—that §§ 19858(a) and 19858.5 discriminate against companies engaged in interstate commerce—fares no better. Even assuming this is not a *Pike* balancing argument by another name, there is no actionable dormant Commerce Clause discrimination. Companies engaged in the interstate gambling markets can invest in California businesses, and Californians can invest in the interstate gambling industry; all that is prevented is certain firms engaging in certain co-ownership activities when a California cardroom license is involved. That plaintiffs may have to forgo other business opportunities does not mean §§ 19858(a) and 19858.5 discriminate in a way that the dormant Commerce Clause prohibits. Indeed, we have previously rejected arguments that state laws treating out-of-state and in-state entities similarly, but which prevent them from structuring or operating their business as they prefer, reflect improper discrimination in favor of in-state interests. *See Rocky Mt. Farmers*, 730 F.3d at 1092 ("[T]he dormant Commerce Clause does not guarantee that ethanol producers may compete on the terms they find most convenient."); *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 731 F.3d 843, 847 (9th Cir. 2013) ("What is really at issue is the

shifting of business from one competitor to another, not a burden on interstate commerce.").

The Supreme Court's decision in *Exxon Corporation v. Governor of Maryland*, 437 U.S. 117 (1978), is instructive. In *Exxon*, the Supreme Court considered a Maryland law that prevented a gasoline producer or refiner from operating retail gas stations in the state, and that required divestiture of in-state gas stations, based on concerns that producers and refiners were favoring their own service stations during a time of gasoline shortage. *Id.* at 119. Exxon, which produced and refined gasoline outside of Maryland and which owned 36 retail stations in Maryland, claimed the Maryland law violated the dormant Commerce Clause. *Id.* at 121. In particular, Exxon pointed out that because all gasoline was produced and refined outside of Maryland, "the burden of the divestiture requirements f[ell] solely on interstate companies." *Id.* at 125.

The Supreme Court held that Maryland's law did not violate the dormant Commerce Clause. It observed that interstate firms who did not produce or refine gasoline could still operate within Maryland. *Id.* at 125–26. Although some interstate firms like Exxon were disadvantaged, "[t]he fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Id.* at 126. Nor did the dormant Commerce Clause "protect[] the particular structure or methods of operation in a retail market." *Id.* at 127. Maryland's law survived review because it did not "prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market." *Id.* at 126.

Similar to *Exxon*, California here has decided that a single person or entity owning or controlling two kinds of businesses is problematic. In *Exxon*, Maryland forced companies to decide whether they would rather operate in-state service stations or gasoline production and refining businesses. California has required plaintiffs and others to decide whether to engage in cardroom operations or to invest in gambling businesses that California regards as unlawful. In *Exxon*, the gasoline production and refining took place entirely out of state. *Id.* at 123. Here, the casino businesses in which plaintiffs would invest are located entirely out of state as well. As in *Exxon*, this does not constitute discrimination against interstate commerce, especially when here, the reason the casinos are located outside of California is because California has exercised its traditional authority to limit casino gambling within the state. Although plaintiffs argue that Maryland in *Exxon* was regulating an in-state problem, the same can be said here, given that §§ 19858(a) and 19858.5 pertain to cardrooms operating within California.

In short, nothing in the text, history, or operation of §§ 19858(a) and 19858.5 suggests discrimination against interstate commerce, which is the focus of the dormant Commerce Clause. *See Pork Producers*, 598 U.S. at 369.

## B

Plaintiffs next argue that the statutes are unconstitutional because they "impermissibly regulate interstate commerce occurring wholly outside of California," in that plaintiffs are precluded from investing in out-of-state casinos with no connection to the state. *Pork Producers* confirms that this extraterritoriality theory lacks merit.

In advancing their position, plaintiffs rely on a line of Supreme Court cases suggesting that "[t]he critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy*, 491 U.S. at 336. Even before *Pork Producers*, we would have met this argument with skepticism. *See Rocky Mt. Farmers*, 730 F.3d at 1101 ("In the modern era, the Supreme Court has rarely held that statutes violate the extraterritoriality doctrine.").

But *Pork Producers* sealed it. As we discussed above, the Supreme Court in *Pork Producers* specifically rejected an "almost *per se* rule forbidding enforcement of state laws that have the practical effect of controlling commerce outside the State, even when those laws do not purposely discriminate against out-of-state economic interests." 598 U.S. at 371 (quotations omitted). And the Court clarified that cases like *Healy*, on which plaintiffs here rely, turned on an impermissible discriminatory purpose against out-of-state economic interests, not any freestanding extraterritoriality principle. *Id.* at 373–74.

In this case, §§ 19858(a) and 19858.5 do not offend the dormant Commerce Clause under *Pork Producers* because they regulate conduct within the state, namely, the licensing and operation of California cardrooms. California has therefore validly exercised "the usual 'legislative power of a State to act upon persons and property within the limits of its own territory.'" *Id.* at 375 (quoting *Hoyt v. Sprague*, 103 U.S. 613, 630 (1881)). It is of course true that compliance with §§ 19858(a) and 19858.5 results in extraterritorial spillover effects on what plaintiffs may do outside the state. But these effects are simply a function of California's non-discriminatory "terms of doing business . . . in the state."

*Monarch Content Mgmt. LLC v. Ariz. Dep't of Gaming*, 971 F.3d 1021, 1031 (9th Cir. 2020).

As the Supreme Court explained in *Pork Producers*, "many (maybe most) state laws have the 'practical effect of controlling' extraterritorial behavior," but in the absence of economic protectionism, the nearly inevitable extraterritorial effects that state laws produce does not mean these laws run afoul of the Commerce Clause's negative proscription. 598 U.S. at 374. Indeed, we recognized this same point a decade ago: "[E]ven when state law has significant extraterritorial effects, it passes [dormant] Commerce Clause muster when, as here, those effects result from the regulation of in-state conduct." *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1145 (9th Cir. 2015).

Nor is this a case involving laws that "*directly* regulate[] out-of-state transactions by those with *no* connection to the State." *Pork Producers*, 598 U.S. at 376 n.1 (discussing *Edgar*, 457 U.S. at 641–43). Plaintiffs have connections with California because they operate cardrooms there. And the transaction that California law most directly regulates is the licensing of cardrooms in the state. Sections 19858(a) and 19858.5 say nothing about the general ability of persons to invest in out-of-state casino businesses; they merely place limits on that ability in the case of persons who operate cardrooms within the state, to prevent assertedly deleterious in-state effects. As the work of the Little Hoover Commission shows, reasonable minds can debate whether California's cardroom licensing restrictions are necessary to prevent the perceived ills of casino gambling from intruding into the state. But that debate is one for state policymakers, not the courts, to resolve. The California Legislature's judgment that the licensing of in-state cardrooms should not

coincide with ownership or control over gambling operations that are prohibited in California—whether those businesses are located "within or without this state," Cal. Bus. & Prof. Code § 19858(a)—does not violate any dormant Commerce Clause command.

Indeed, just as in *Pork Producers*, plaintiffs' position here would seemingly lead to the sweeping invalidation of laws long thought permissible. In *Pork Producers*, the Supreme Court rejected a per se dormant Commerce Clause bar on state regulation with extraterritorial effects because it would disqualify "laws long understood to represent valid exercises of the States' constitutionally reserved powers," such as "'[i]nspection laws, quarantine laws, [and] health laws of every description' that have a 'considerable' influence on commerce outside their borders." 598 U.S. at 375 (quoting *Gibbons v. Ogden*, 9 Wheat 1, 203 (1824)).

To this list we could add state licensing laws, for the plaintiffs' position would ostensibly prevent states, in the name of the dormant Commerce Clause, from conditioning a state license on the licensee foregoing some other activity. *But see, e.g.*, *Exxon*, 437 U.S. at 119–21, 127–29 (rejecting dormant Commerce Clause challenge to Maryland law prohibiting petroleum producers from operating retail gas stations in the state); *Monarch Content Mgmt.*, 971 F.3d at 1025, 1031 (rejecting dormant Commerce Clause challenge to Arizona law requiring any simulcast of horse racing that originates from within or outside Arizona to be offered to all covered waging facilities in the state, because this is merely a requirement of "doing business if [simulcast companies] choose[] to provide simulcasts in the state"). Invalidating non-discriminatory state licensing laws would be a significant expansion of the dormant Commerce Clause and, in this case, a serious intrusion on states' traditional ability

to regulate gambling activity.  *See Murphy*, 584 U.S. at 484; *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999).

In pressing their extraterritoriality argument, plaintiffs heavily rely on two of our past cases, *Sam Francis Foundation v. Christies, Inc.*, 784 F.3d 1320 (9th Cir. 2015) (en banc), and *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608 (9th Cir. 2018).  But neither case supports our finding a dormant Commerce Clause violation here based on supposedly improper extraterritorial effects.

In *Sam Francis*, we held that a California law requiring royalties to be paid to an artist for fine art sales "whenever 'the seller resides in California *or* the sale takes place in California'" violated the dormant Commerce Clause.  784 F.3d at 1323 (quoting Cal. Civ. Code § 986(a)).  Applying *Healy*, we concluded that the first part of the law had an impermissible extraterritorial effect because it "regulate[d] sales that take place outside of California" that "ha[d] no necessary connection with the state other than the residency of the seller."  *Sam Francis*, 784 F.3d at 1323.  The law in this respect regulated entirely out-of-state activities, requiring the payment of a royalty "even if the sculpture, the artist, and the buyer never traveled to, or had any connection with, California."  *Id.*  But unlike the statute in *Sam Francis*, which we characterized as "involv[ing] regulation of wholly out-of-state conduct," the California statutes at issue here "regulate[] *in-state conduct* with allegedly significant out-of-state practical effects."  *Id.* at 1324.  *Sam Francis* is therefore distinguishable.  *See Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1030 (9th Cir. 2021) (distinguishing *Sam Francis* on the same basis).  Although California questions whether *Sam Francis* remains good law after the

Supreme Court's decision in *Pork Producers*, we leave that matter for another day.

*Daniels Sharpsmart* is also distinguishable. There we considered California's requirement that medical waste treatment facilities in California must incinerate all medical waste generated in the state, regardless of where it is disposed. *Daniels Sharpsmart*, 889 F.3d at 612–13. If the waste was transported out of state for disposal, California still required it to be incinerated, "even if the law of another state permitted an alternative method." *Id.* at 613. Relying on *Healy*, we held that this violated the dormant Commerce Clause. *Id.* at 614–16.

Although *Daniels Sharpsmart* contains extraterritoriality-type language on which plaintiffs here understandably rely, *Daniels Sharpsmart* was a different case. There we were concerned with "an attempt to reach beyond the borders of California and control transactions that occur wholly outside of the State after the material in question—medical waste—has been removed from the State." *Id.* at 615. Because the medical waste had already left the state by this point, "[t]here [was] nothing to indicate that the transactions had any effect whatsoever in California." *Id.* at 616.

That is not the case here, because California's cardroom licensing laws regulate the ownership of cardrooms operating in the state. Unlike in *Daniels Sharpsmart*, §§ 19858(a) and 19858.5 are "an attempt" by California "to protect California and its residents," *id.* at 615, from the perceived harms of commingling cardroom licensure with the non-negligible ownership or control over gambling operations deemed illegal under state law. The provisions at issue here do not reach out and purport to regulate wholly-

of-state conduct; they instead condition a state license for conducting in-state activities on plaintiffs foregoing certain business interests, whether within or outside the state.

Especially in light of *Pork Producers*, we lack a sound basis to extend *Daniels Sharpsmart* to the distinct situation before us.  As we noted in our own *Pork Producers* decision, which the Supreme Court later affirmed, "[w]e have not extended the *Daniel[s] Sharpsmart* line of cases to a situation where the state law had an upstream effect only as a practical matter on out-of-state transactions."  6 F.4th at 1031.  That logic holds true here.  Although we appreciate California's position that *Daniels Sharpsmart* is in tension with *Pork Producers*, that is not an issue we must resolve today.

In sum, plaintiffs' reliance on a dormant Commerce Clause-backed extraterritoriality principle fails.

## C

Finally, plaintiffs argue that §§ 19858(a) and 19858.5 violate the dormant Commerce Clause under *Pike*'s balancing test.  Plaintiffs here face a heavy burden: "the Supreme Court 'has not invalidated a law under *Pike*' in more than 30 years." *Truesdell v. Friedlander*, 80 F.4th 762, 773 (6th Cir. 2023) (quoting *Garber v. Menendez*, 888 F.3d 839, 845 (6th Cir. 2018)).  Under *Pike*, plaintiffs must first show that the challenged laws impose a "substantial burden on interstate commerce; if so, we determine whether that burden is "clearly excessive" in relation to the law's putative local benefits.  *See, e.g.*, *Wayfair*, 585 U.S. at 173; *Optometrists II*, 682 F.3d at 1155.

As we discussed above, the Supreme Court in *Pork Producers* recently reemphasized that the *Pike* line of cases

can largely be justified under the dormant Commerce Clause's core anti-discrimination principle. *See* 598 U.S. at 377–78. Indeed, "most statutes that impose a substantial burden on interstate commerce do so because they are discriminatory." *Nat'l Pork Producers Council*, 6 F.4th at 1032 (alteration omitted) (quoting *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris* (*Eleveurs I*), 729 F.3d 937, 952 (9th Cir. 2013)). Because plaintiffs have not demonstrated that §§ 19858(a) and 19858.5 discriminate against out-of-state economic interests, their "claim falls well outside of *Pike*'s heartland." *Pork Producers*, 598 U.S. at 380.

Even so, plaintiffs' claims otherwise fail under *Pike* because plaintiffs have not demonstrated a significant or substantial burden on interstate commerce. *See Nat'l Pork Producers Council*, 6 F.4th at 1032 ("We have held that a statute imposes such a significant burden [under *Pike*] only in rare cases."). Absent discrimination that favors in-state economic interests, state laws can create a substantial burden against interstate commerce based on "inconsistent regulation of activities that are inherently national or require a uniform system of regulation." *Eleveurs I*, 729 F.3d at 952 (quoting *Optometrists II*, 682 F.3d at 1148). Gambling does not involve an inherently national system of regulation, given the states' long-understood authority in this area. *See Murphy*, 584 U.S. at 484; *Greater New Orleans Broad. Ass'n*, 527 U.S. at 187; *Artichoke Joe's*, 353 F.3d at 737–40.

More generally, whatever effects §§ 19858(a) and 19858.5 have on interstate commerce, those effects cannot be regarded as substantial. The challenged laws prevent only a small band of persons—those holding California cardroom licenses—from investing in gaming enterprises that are illegal under California law. And even if we were to

consider putative investors in California cardrooms who are not before the court and who face limitations in their abilities to devote capital to California cardrooms, there is no indication that this population of persons is especially large, either.

As California fairly points out, both we and the Supreme Court rejected a *Pike* argument in *Pork Producers*, even though "California's required changes to pig-farming and pork-production practices throughout the United States will cost American farmers and pork producers hundreds of millions (if not billions) of dollars." *Pork Producers*, 598 U.S. at 405–06 (Kavanaugh, J., concurring in part and dissenting in part). If the *Pike* challenge was unsuccessful in *Pork Producers*, it cannot succeed here. That is especially so considering that the district court also construed §§ 19858(a) and 19858.5 to allow plaintiffs to "enter into a business arrangement with an entity that engages in prohibited gambling so long as their joint venture does not also engage in illegal gambling." Neither side contests the district court's statutory interpretation, which further limits the effect that §§ 19858(a) and 19858.5 will have on interstate commerce.

Ultimately, plaintiffs' burden argument comes down to the fact that §§ 19858(a) and 19858.5 impose a burden on them. But *Pike* "protects the interstate market, not particular interstate firms, from . . . burdensome regulations." *Exxon*, 437 U.S. at 127–28; *see also Pork Producers*, 598 U.S. at 383–84 (plurality); *Nat'l Pork Producers Council*, 6 F.4th at 1032. In other words, "a loss to some specific market participants does not, without more, suggest that the state statute impedes substantially the free flow of commerce from state to state." *Nat'l Pork Producers Council*, 6 F.4th at 1033 (brackets omitted) (quoting *Burlington N. R.R. Co.*

*v. Dep't of Pub. Serv. Regul.*, 763 F.2d 1106, 1114 (9th Cir. 1985)). The burden on plaintiffs thus does not alone demonstrate a substantial burden on interstate commerce. And because plaintiffs have not made this required showing under the first part of the *Pike* framework, like the district court, we "need not determine whether the benefits of the challenged law are illusory." *Id.* at 1033 (quoting *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 452 (9th Cir 2019)).

\*   \*   \*

"Preventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.'" *Pork Producers*, 598 U.S. at 390 (quoting *Conway v. Taylor's Ex'r*, 66 U.S. 603, 634 (1862)). For the reasons we have explained, the cardroom licensing restriction in California Business and Professions Code §§ 19858(a) and 19858.5 does not violate the dormant Commerce Clause.

**AFFIRMED.**