FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| PERIDOT TREE WA, INC., | No. 24-3481 |
| *Plaintiff - Appellant*, | D.C. No. 3:23-cv-06111-TMC |
| v. | |
| WASHINGTON STATE LIQUOR AND CANNABIS CONTROL BOARD; WILLIAM LUKELA, | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Western District of Washington
Tiffany M. Cartwright, District Judge, Presiding

| | |
|---|---|
| PERIDOT TREE, INC.; KENNETH GAY, | No. 24-7196 |
| *Plaintiffs - Appellants*, | D.C. No. 2:22-cv-00289-KJM-SCR |
| v. | |
| CITY OF SACRAMENTO; DAVINA SMITH, | |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, District Judge, Presiding

Argued and Submitted June 3, 2025
Seattle, Washington

Filed January 2, 2026

Before: Johnnie B. Rawlinson, Daniel A. Bress, and Patrick
J. Bumatay, Circuit Judges.

Opinion by Judge Bress

# SUMMARY[*]

## Dormant Commerce Clause

In these consolidated appeals, the panel affirmed the judgments of two district courts dismissing actions challenging, under the dormant Commerce Clause, cannabis licensing dispensary schemes in the City of Sacramento and the State of Washington, which require a person to have been a resident of the area for a specified period of time to be eligible for a cannabis dispensary license.

Both district courts held that the dormant Commerce Clause does not apply to residency requirements for cannabis dispensaries because marijuana is illegal under federal law.

Affirming the judgments of the district courts, the panel declined to extend the dormant Commerce Clause to interstate commerce in a drug market that Congress has declared illegal. Mindful of the Supreme Court's directive that extreme caution is warranted before a court deploys its implied authority under the dormant Commerce Clause, the panel saw insufficient license in Supreme Court precedent to use the judge-made dormant Commerce Clause to promote a constitutional right to interstate commerce that is unlawful under federal law.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Jeffrey M. Jensen (argued), Jeffrey M. Jensen PC, Beverley Hills, California; Christian Kernkamp, Kernkamp Law APC, Los Angeles, California; for Plaintiff-Appellant.

Tera M. Heintz (argued), Deputy Solicitor General; Penny Allen, Senior Counsel; Samantha Hellwig and Jonathan Pitel, Assistant Attorneys General; Robert W. Ferguson, Washington Attorney General; Office of the Washington Attorney General, Olympia, Washington; Lee H. Roistacher (argued), Dean Gazzo Roistacher LLP, Solana Beach, California; Andrea M. Velasquez, Supervising Deputy City Attorney; Susan A. Wood, City Attorney; Sacramento Office of the City Attorney, Sacramento, California; for Defendants-Appellees.

Jason Horst, Horst Legal Counsel PC, Walnut Creek, California, for Amicus Curiae Alliance for Sensible Markets.

Taylor Kayatta and Arthur J. Wylene, Rural County Representatives of California, Sacramento, California, for Amici Curiae California State Association of Counties and League of California Cities.

**OPINION**

BRESS, Circuit Judge:

Marijuana remains illegal under federal law, but many states have legalized its sale and use for medicinal and recreational purposes.  To ensure proper oversight over marijuana sales, these states and localities have adopted a variety of rules governing cannabis dispensaries.  As part of these regimes, certain jurisdictions require a person to have been a resident of that area for a specified period of time to be eligible for a cannabis dispensary license, or else give priority to these persons when issuing licenses.  We are asked to decide whether two of these cannabis dispensary licensing regimes—those of the State of Washington and the City of Sacramento—violate the dormant Commerce Clause.

We hold that the dormant Commerce Clause does not apply here.  Mindful of the Supreme Court's directive that "'extreme caution' is warranted before a court deploys" its "implied authority" under the dormant Commerce Clause, *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 390 (2023) (quoting *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 310 (1997)), we decline to extend the dormant Commerce Clause to interstate commerce in a drug market that Congress has declared illegal.  Although we appreciate that judges on other courts are divided on this question, we see insufficient license in Supreme Court precedent to use the judge-made dormant Commerce Clause to promote a constitutional right to interstate commerce that is unlawful under federal law.  The two district courts in these cases both reached the same conclusion.  In both cases, we therefore affirm.

I

A

Under the federal Controlled Substances Act (CSA), it is unlawful "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance," including marijuana. 21 U.S.C. § 841(a)(1); *see* 21 U.S.C. § 812(c) (classifying marijuana as a Schedule I substance); *Patients Mut. Assistance Collective Corp. v. Comm'r of Internal Revenue*, 995 F.3d 671, 674 (9th Cir. 2021). Marijuana's classification under the CSA reflects a congressional determination about marijuana's "high potential for abuse, lack of any accepted medical use, and absence of any accepted safety for use in medically supervised treatment." *Gonzales v. Raich*, 545 U.S. 1, 14 (2005) (citing 21 U.S.C. § 812(b)(1)).

Despite this longstanding federal prohibition, many states have legalized marijuana for adult medicinal and recreational purposes. *See, e.g.*, *Raich*, 545 U.S. at 5; *Standing Akimbo, LLC v. United States*, 141 S. Ct. 2236, 2237 (2021) (statement of Thomas, J., respecting the denial of certiorari); *Peridot Tree, Inc. v. City of Sacramento*, 94 F.4th 916, 921 (9th Cir. 2024). In response, Congress has sent "mixed signals." *Peridot Tree*, 94 F.4th at 923. For the last approximately ten years, Congress has included a version of the Rohrabacher-Farr Amendment in its appropriation to the U.S. Department of Justice. *See, e.g.*, Consolidated Appropriations Act of 2024, Pub. L. No. 118-42, § 531, 138 Stat. 25 (2024); *Standing Akimbo*, 141 S. Ct. at 2237 (statement of Thomas, J.); *Peridot Tree*, 94 F.4th at 923–24; *United States v. Kleinman*, 880 F.3d 1020, 1027 (9th Cir. 2017); *Northeast Patients Grp. v. United Cannabis Patients & Caregivers of Maine*, 45 F.4th 542, 547–48 (1st

Cir. 2022).  This appropriations rider provides that "[n]one of the funds made available under this Act to the Department of Justice may be used . . . to prevent [specified states] from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana."  Consolidated Appropriations Act of 2024, 138 Stat. at 174.

For its part, the DOJ in recent times has not made marijuana an enforcement priority.  *See, e.g.*, *Peridot Tree*, 94 F.4th at 924.  Recently, on December 18, 2025, the President signed an Executive Order concerning the use of marijuana for medical purposes.  *See* Increasing Medical Marijuana and Cannabidiol Research, Executive Order (Dec. 18, 2025), https://www.whitehouse.gov/presidential-actions/2025/12/increasing-medical-marijuana-and-cannabidiol-research/.  As part of this Executive Order, the President directed the Attorney General to "take all necessary steps to complete the rulemaking process related to rescheduling marijuana to Schedule III of the CSA . . . in accordance with Federal law."  *Id.*  The Executive Order further directs the Executive Branch to "work with the Congress to update the statutory definition of final hemp-derived cannabinoid products to allow Americans to benefit from access to appropriate full-spectrum [cannabidiol] products while preserving the Congress's intent to restrict the sale of products that pose serious health risks."  *Id.*  Nevertheless, at this time, marijuana remains illegal under the CSA.

California legalized recreational cannabis in 2016, and many counties and cities then passed ordinances to regulate its sale, production, and purchase.  *Peridot Tree*, 94 F.4th at 921.  These measures were designed to "prevent state-level legalization from harming local communities" while also

creating business opportunities for "those negatively affected by marijuana's past criminalization." *Id.* Sacramento's Cannabis Opportunity Reinvestment and Equity (CORE) Program is the city's mechanism for licensing marijuana dispensaries (medical and recreational). *Id.* The CORE Program established five different classifications for licensing purposes, two of which are relevant here:

> Classification 1. A current or former resident of the City of Sacramento who previously resided or currently resides in a low-income household and was either: a) arrested or convicted for a cannabis related crime in Sacramento between the years 1980 and 2011; or is b) an immediate family member of an individual described in subsection a of Classification 1 or Classification 2.

> Classification 2. A current or former resident of the City of Sacramento who has lived in a low-income household for at least five (5) years, between the years of 1980 and 2011 in the following zip codes: [¶] 95811, 95815, 95817, 95820, 95823, 95824, 95826, 95828, and 95818.

Both of these Classifications require participants to be current or former Sacramento residents. The other Classifications pertaining to businesses are keyed to the Classification 1 and 2 criteria.

After implementing the CORE Program, Sacramento set aside ten storefront cannabis dispensary permits specifically for Classification 1 and 2 participants only. *See Peridot Tree*,

94 F.4th at 922.  A city ordinance limited the total number of permits to 40, and the other 30 had already been granted, so the only people eligible to apply for an available permit were those who met the residency requirement.  *Id.*

Like California, Washington has also legalized marijuana, doing so in 2012 through a voter initiative known as Initiative Measure 502.  This Measure authorized the Washington State Liquor & Cannabis Board ("LCB") to regulate the cannabis market.  RCW §§ 69.50.331(4), .342, .345 (2013).  Since 2015, Washington has imposed a six-month residency requirement for cannabis dispensary licenses.  *Id.* § 69.50.331(1)(b) (2015).  In 2020, Washington created the Social Equity Program in an effort "to reduce barriers to entry to the cannabis industry for individuals and communities most adversely impacted by the enforcement of cannabis-related laws."  2020 Wash. Sess. Laws Ch. 236 § 1(1).  Under this program, which bears similarities to the Sacramento regime that we discussed above, the LCB now reserves retail cannabis licenses exclusively for social equity applicants.  RCW § 69.50.335(1)(a), (2)(a).

In 2022, the LCB adopted the Social Equity Program criteria.  To be considered, applicants must meet the following criteria:

> (b) At least a 51 percent majority, or controlling interest, in the applicant, must be held by a person, or persons, who has or have resided in Washington state for six months prior to the application date, consistent with RCW 69.50.331, and meets at least two of the following qualifications:

> (i) Qualification 1: The social equity applicant or applicants have lived in a disproportionately impacted area in Washington state for a minimum of five years between 1980 and 2010; or

> (ii) Qualification 2: The social equity applicant or a family member of the applicant has been arrested or convicted of a cannabis offense; or

> (iii) Qualification 3: The social equity applicant's household income in the year prior to submitting the application was less than the median household income within the state of Washington as calculated by the United States Census Bureau.

Wash. Admin. Code § 314-55-570(2) (2022). "Disproportionately impacted area" means: "a census tract within Washington state where community members were more likely to be impacted by the war on drugs. The board will provide maps to identify disproportionately impacted areas." *Id.* § 314-55-570(1)(a). The LCB posted maps identifying disproportionately impacted areas in Washington by decade, from 1980 to 2010. Applicants are awarded points according to a scoring rubric—40 points for having lived in a disproportionately impacted area, and 20 to 40 additional points if they have lived in the area for longer periods of time. Washington amended its social equity provision effective January 2025, but in ways that are immaterial to this case. *See id.* § 314-55-570(4) (2025).

B

Kenneth Gay is a resident of Michigan and the majority owner of Peridot Tree, Inc., a California corporation, and Peridot Tree WA, a Washington corporation.  The Peridot Tree entities are the plaintiffs in these two cases.  We will refer to them in the singular, as Peridot.

Peridot applied for a license in King County, Washington through the Social Equity Program.  On September 17, 2023, the LCB notified Peridot that its application would not be considered because Peridot failed to meet the minimum residency qualifications.  Peridot asserts that it met all application requirements except those favoring Washington residents.  A similar story played out in Sacramento.  Peridot claims it met Sacramento's requirements for CORE Classification 1 and 2, except for the residency requirement, which was the reason its application to operate a Sacramento cannabis dispensary was rejected.

Peridot filed substantially identical lawsuits under 42 U.S.C. § 1983 claiming that the Sacramento and Washington cannabis dispensary licensing schemes violated the dormant Commerce Clause by preferring in-state interests over out-of-state competitors.  The Sacramento case had a prior trip to our court on a different issue involving abstention.  *See Peridot Tree*, 94 F.4th at 924.  Ultimately, the district courts in both cases dismissed Peridot's suits under Rule 12(b)(6) and denied Peridot's requests for preliminary injunctions.

Both district courts held that the dormant Commerce Clause does not apply to residency requirements for cannabis dispensaries because marijuana is illegal under federal law.  The district court in the Western District of Washington, for example, concluded that the dormant Commerce Clause does not "protect an interstate market that

Congress affirmatively prohibited, given that protecting this market would facilitate illegal interstate activity. Peridot cannot use the dormant Commerce Clause to demand a constitutional right to participate in an illegal interstate market." The district court in the Eastern District of California reasoned similarly in an equally thoughtful opinion on this question of first impression in the Ninth Circuit.

We consolidated these cases for oral argument and now issue this single opinion that resolves both appeals. We review dismissals under Rule 12(b)(6) de novo. *See, e.g.*, *Pardini v. Unilever U.S., Inc.*, 65 F.4th 1081, 1084 (9th Cir. 2023).

## II

### A

The Constitution's Commerce Clause gives Congress the power to "regulate Commerce . . . among the several States." U.S. CONST. art. I, § 8, cl. 3. Although it is an affirmative grant of power to Congress, the Supreme Court has interpreted the Commerce Clause to impliedly preclude certain state laws that restrain interstate commerce. *See, e.g.*, *Pork Producers*, 598 U.S. at 368; *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 514 (2019). This "'negative' aspect of the Commerce Clause prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine & Spirits Retailers Ass'n*, 588 U.S. at 514 (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)).

The "very core" of the dormant Commerce Clause is that States may not discriminate against interstate commerce through "regulatory measures designed to benefit in-state

economic interests by burdening out-of-state competitors." *Pork Producers*, 598 U.S. at 369 (first quoting *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997), and then quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008)).   A law that discriminates against interstate commerce is "'virtually *per se invalid*' and will survive only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'"   *Dep't of Revenue of Ky.*, 553 U.S. at 338 (citation omitted) (quoting *Oregon Waste Sys., Inc. v. Dep't of Env'tl Quality of Ore.*, 511 U.S. 93, 99, 101 (1994)); *see also South Dakota v. Wayfair, Inc.*, 585 U.S. 162, 173 (2018); *Flynt v. Bonta*, 131 F.4th 918, 923 (9th Cir. 2025).   By presumptively prohibiting discrimination against interstate commerce, the dormant Commerce Clause inhibits States from "restrain[ing] the free exchange of goods and services in an interstate market." *Flynt*, 131 F.4th at 923; *see also Pork Producers*, 598 U.S. at 369; *South Dakota*, 585 U.S. at 173; *Dep't of Revenue of Ky.*, 553 U.S. at 337–38.

In analyzing the legal question in this case, we are guided by two key aspects of the Supreme Court's dormant Commerce Clause jurisprudence.  First, "the proposition that the Commerce Clause by its own force restricts state protectionism is deeply rooted in" the Supreme Court's case law.  *Tenn. Wine & Spirits Retailers Ass'n*, 588 U.S. at 515. It is our role as an inferior court to apply this case law, faithful to its moorings and objectives.

Second, although the dormant Commerce Clause is based on longstanding precedent, the Supreme Court has also instructed that we must tread cautiously when considering whether to invalidate state laws under the court-inferred dormant Commerce Clause.  As the Supreme Court recently reiterated, "'extreme caution' is warranted before a

court deploys this implied authority." *Pork Producers*, 598 U.S. at 390 (quoting *Gen. Motors Corp.*, 519 U.S. at 310). In *Pork Producers*, the Supreme Court's latest word in this area, the Court "decline[d] th[e] invitation" to fashion "new and more aggressive constitutional restrictions on the ability of States to regulate goods sold within their borders." *Id.* at 364. As the Court made clear, "[p]reventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy.'" *Id.* at 390 (quoting *Conway v. Taylor's Executor*, 66 U.S. 603, 634, 1 Black 603 (1861)). This caution about overriding democratically enacted laws through the "implied judicial power" of the dormant Commerce Clause, *id.*, is itself deeply rooted in the Court's longstanding guidance in this area, which has historically emphasized this same point. *See, e.g.*, *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343–45 (2007); *Gen. Motors Corp.*, 519 U.S. at 309–10; *S.C. State Highway Dep't v. Barnwell Bros.*, 303 U.S. 177, 190–91 (1938); *Conway*, 66 U.S. at 634, 1 Black 603.

## B

This case raises the question of whether the dormant Commerce Clause even applies to state restrictions on an interstate market that Congress has deemed unlawful. Is there, in effect, an implied constitutional right to engage in illegal interstate commerce? The Supreme Court has never answered this question. But two other circuits have, as have a number of district courts. Although other circuits have held that the dormant Commerce Clause applies to marijuana even though it is illegal under federal law, judges on those courts have disagreed and would have held otherwise. Numerous district courts, meanwhile, have aligned themselves with those dissenting views and have concluded

that the dormant Commerce Clause does not apply to protectionist marijuana laws.  Before turning to the question ourselves, we review what others have said on the issue.

The first circuit to address this issue was the First Circuit in *Northeast Patients Group*, 45 F.4th at 542.  That case concerned a dormant Commerce Clause challenge to a Maine law requiring that officers and directors of medical marijuana dispensaries operating in Maine be Maine residents.  *Id.* at 544.  Over a dissent, the First Circuit held that the Maine law violated the dormant Commerce Clause.

The First Circuit began by explaining that if Maine's residency requirement "were applied to a lawful market," it would not survive dormant Commerce Clause scrutiny because it would not be "narrowly tailored to serve a legitimate local purpose."  *Id.* at 546.  The court then concluded that it made no difference that "federal law makes participation in the market to which the residency requirement applies illegal."  *Id.* at 546–47.

The First Circuit recognized that notwithstanding the CSA, there "is an established, albeit illegal, interstate market" in marijuana.  *Id.* at 547 (emphasis removed) (quoting *Raich*, 545 U.S. at 18).  It rejected the notion that through the CSA, Congress had effectively displaced the dormant Commerce Clause in this area or otherwise consented to protectionist state measures, believing any such congressional intent could not be sufficiently discerned.  *Id.* at 548–56.  Nor did it matter to the dormant Commerce Clause analysis that marijuana is illegal under federal law.  In the First Circuit's view, "given the long-held understanding that the dormant Commerce Clause has a negative aspect, there would seem to be no basis for our declining to enforce the dormant Commerce Clause unless

there were a reason for us to think that Congress" has articulated a contrary intent, which Congress had not done. *Id.* at 556–57.

Judge Gelpí issued a forceful dissent. Judge Gelpí "disagree[d] that the test we have developed for the mine-run of dormant Commerce Clause cases applies automatically or with equal vigor when the market in question is illegal as a matter of federal law." *Id.* at 558 (Gelpí, J., dissenting). In his view, "the principles that animate the dormant Commerce Clause" do not apply in this context. *Id.* A central rationale of the dormant Commerce Clause is maintaining "an unencumbered 'national market.'" *Id*. at 559 (quoting *Gen. Motors Corp.*, 519 U.S. at 299). That "'fundamental objective'" is "inapplicable" when "Congress has already outlawed the national market for marijuana." *Id.* (quoting *Gen. Motors Corp.*, 519 U.S. at 299). Judge Gelpí would have held that "illegal markets are constitutionally different in kind," and that the dormant Commerce Clause should thus not be understood to "protect[] the free-flowing operation of national markets that Congress has already made illegal." *Id.* That was especially true considering that by the logic of the majority opinion, the dormant Commerce Clause would promote the free exchange of heroin, fentanyl, or any other illicit good that a state might try to legalize. *Id.*

The Second Circuit in *Variscite NY Four, LLC v. New York State Cannabis Control Bd.*, 152 F.4th 47 (2d Cir. 2025), was the second federal court of appeals to address this issue. It considered a dormant Commerce Clause challenge to a New York law that prioritized New York residents for marijuana dispensary licenses. *Id.* at 52, 54–55. Like the First Circuit, the Second Circuit held that this regime violated the dormant Commerce Clause, although once

again, the panel was not unanimous in its decision.  *Id.* at 65–66.

The *Variscite NY Four* majority began by explaining that the dormant Commerce Clause is "expressed through a bright-line rule: 'the Commerce Clause prohibits the enforcement of state laws driven by economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'"  *Id.* at 60 (quoting *Pork Producers*, 598 U.S. at 369).  The court acknowledged that the "fundamental objective" of maintaining a national market free of state interference "applies with some irony in the context of *illicit* markets."  *Id.* (quoting *Gen. Motors Corp.*, 519 U.S. at 299).  But in the court's view, "that objective should not be conflated with the rule itself."  *Id.*  It was thus of "no constitutional import" that marijuana is illegal at the federal level.  *Id.* (quoting *Raich*, 545 U.S. at 19 n.29).  And exempting illegal markets from the dormant Commerce Clause would produce market distortion if Congress later legalized marijuana, for at that point States would have "bake[d] in advantages for their residents."  *Id.* at 61.  Nor, the Second Circuit concluded, had Congress sufficiently expressed its intent to bless protectionist state regimes in this area.  *Id.* at 61–63.

Chief Judge Livingston dissented, describing the majority's conclusion as "obviously wrong."  *Id.* at 66 (Livingston, C.J., dissenting).  In Chief Judge Livingston's view, "[w]hen Congress criminalizes a market," we should "presume that it authorizes states to enact their own laws that aid that objective, whether by banning, restricting, or burdening those transactions."  *Id.* at 67.  And we should "not interpret a doctrine implied from the Commerce Clause—an affirmative grant of power to Congress—to *require* states to

enact laws that promote the very interstate commerce Congress wants to eradicate." *Id.*[1]

The First and Second Circuits are presently the only federal courts of appeals to evaluate whether the dormant Commerce Clause applies to protectionist marijuana laws. At the district court level, the views of the dissents in these cases have found greater purchase. A few district courts, like the First and Second Circuits, have held that the dormant Commerce Clause invalidates discriminatory cannabis laws. *See NPG, LLC v. City of Portland, Maine*, 2020 WL 4741913, at *9–10 (D. Me. Aug. 14, 2020); *Finch v. Treto*, 606 F. Supp. 3d 811, 831–33 (N.D. Ill. 2022). But many other district courts—including the two decisions on review here—have held that the dormant Commerce Clause does not apply to marijuana given its status as an illegal drug under federal law. *See Charm City Hemp, LLC v. Moore*, 2025 WL 2165173, at *22–23 (D. Md. July 30, 2025); *Fluresh, LLC v. City of Grand Rapids*, 2025 WL 1122034, at *8 (W.D. Mich. Apr. 16, 2025); *Variscite, Inc. v. City of L.A.*, 2025 WL 433448, at *3 (C.D. Cal. Feb. 4, 2025); *Jensen v. Maryland Cannabis Admin.*, 719 F. Supp. 3d 466, 483 (D. Md. 2024), *aff'd by* 151 F.4th 169 (4th Cir. 2025); *Variscite NY Four, LLC v. New York State Cannabis Control Bd.*, 2024 WL 406490, at *12 (N.D.N.Y. Feb. 2, 2024), *overruled by* 152 F.4th 47; *Brinkmeyer v. Washington State Liquor & Cannabis Board*, 2023 WL 1798173, at *9–13 (W.D. Wash. Feb. 7, 2023); *Original Invs., LLC v. State of Oklahoma*, 542

---

[1] The Fourth Circuit recently resolved a dormant Commerce Clause challenge to a Maryland cannabis licensing law. *See Jensen v. Maryland Cannabis Admin.*, 151 F.4th 169 (4th Cir. 2025). But the court held that the law did not discriminate against out-of-state interests. *Id.* at 176–77. The court did not reach "the question of whether the Dormant Commerce Clause applies to the marijuana market." *Id.* at 177 n.3.

F. Supp. 3d 1230, 1231 (W.D. Okla. 2021); *see also Ctrl Alt Destroy v. Elliott*, 2025 WL 790963, at *8 (S.D. Cal. Mar. 12, 2025) (bolstering holding under unclean hands doctrine by relying on the "numerous district courts" that "have held that the protections afforded by the dormant Commerce Clause do not apply to the commercial cannabis industry, a federally illegal market").

Just as both district courts below did, many of these district courts have relied on Judge Gelpí's dissent in the First Circuit case. *See, e.g.*, *Fluresh*, 2025 WL 1122034, at *8; *Jensen*, 719 F. Supp. 3d at 483. As one district court wrote, the goal of the dormant Commerce Clause—"'preserv[ing] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents'"—is "not served by encouraging such a market for a good that Congress has already expressly declared to be illegal and against the public interest." *Jensen*, 719 F. Supp. 3d at 483 (quoting *Northeast Patients Grp.*, 45 F.4th at 558–59 (Gelpí, J., dissenting)).

## C

There is force to the argument that through the CSA, Congress expressed an intent to permit protectionist state regimes that restrict interstate commerce in marijuana, and that the usual test for assessing this congressional intent should be relaxed when Congress has made the good in question illegal. *See Variscite NY Four*, 152 F.4th at 67–70 (Livingston, C.J., dissenting); *Northeast Patients Grp.*, 45 F.4th at 559 (Gelpí, J., dissenting)). But we conclude as an antecedent matter that the dormant Commerce Clause need not be extended to facilitate interstate commerce that is illegal under federal law.

The Supreme Court has never extended the dormant Commerce Clause in this manner or suggested that it should be so extended.  Instead, the Court has explained that the "fundamental objective" of the dormant Commerce Clause is to "preserv[e] a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors."  *Gen. Motors Corp.*, 519 U.S. at 299.  That "fundamental objective" of preserving "'free private trade in the national marketplace,'" *id.* at 287, 299 (quoting *Reeves, Inc. v. Stake*, 447 U.S. 429, 437 (1980)), surely wanes when the national marketplace is prohibited under federal law.

When considering the dormant Commerce Clause, "it is the responsibility of the judiciary to determine whether action taken by state or local authorities unduly threatens the values the Commerce Clause was intended to serve." *Wardair Canada, Inc. v. Florida Dep't of Revenue*, 477 U.S. 1, 7 (1986).  And when "Congress has already outlawed the national market for marijuana," we do not see why the Constitution would insist that we "protect[] the free-flowing operation" of illegal interstate commerce.  *Northeast Patients Grp.*, 45 F.4th at 559 (Gelpí, J., dissenting).  The dormant Commerce Clause reflects an anti-discrimination rule, to be sure, but the Supreme Court has not said that the rule must blindly apply in all contexts.  And it is not too much to think that the "premise" of the Clause's negative component is the existence of a legally valid market that federal law does not proscribe.  *Id.*  Nothing in dormant Commerce Clause precedent requires us to indulge the "obvious 'irony' of applying a doctrine implied from an affirmative grant of power to Congress to preserve a national market that Congress does not want to exist."  *Variscite NY*

*Four*, 152 F.4th at 70 (Livingston, C.J., dissenting) (quotations omitted).

The contours of the dormant Commerce Clause are not so rigid as to be unable to account for the fact that marijuana is illegal under federal law. *See Flynt*, 131 F.4th at 923 ("As a judge-made and enforced doctrine, the strictures of the dormant Commerce Clause have ebbed and flowed over time through case law, with the Supreme Court refining the doctrine's proper scope."). "[E]xtreme caution" and "extreme delicacy" are the orders of the day when considering whether to extend the protections of the dormant Commerce Clause. *Pork Producers*, 598 U.S. at 390 (quotations omitted). The caution that the Supreme Court has counseled reflects not only hesitancy about the ability of courts to fashion principled rules to govern interstate commerce, but the fact that any invocation of the dormant Commerce Clause amounts to a judicial intrusion on a democratically enacted law. *See id.* Here, extending the dormant Commerce Clause to cannabis dispensary licensing regimes would override the democratic process twice over, first by potentially invalidating state and local laws governing marijuana dispensaries, and then by countermanding Congress's own judgment about the harmfulness of the controlled substance in question. The extreme caution we must exercise when working with this implied doctrine would seem at its apex when confronted with the prospect of hammering in a regulatory regime through the blunt force object of a per se rule of invalidity, which would force states to open up their marijuana markets even further once they have opened them partway.

The mixed signals that the federal government has sent about marijuana legalization at the state level do not change our calculus. It is true that Congress has used its power of

the purse to limit DOJ interference with state medical marijuana regimes, *see, e.g.*, Consolidated Appropriations Act of 2024, 138 Stat. at 174, and that federal enforcement, if it can be called that, reflects a non-enforcement approach. But our assessment of the dormant Commerce Clause's reach cannot turn on how much the political branches still believe in the laws that are on the books. "[I]n our constitutional order, it's Congress that passes laws, Congress that saw fit to enact 21 U.S.C. § 841, and Congress that in § 841 made the distribution of marijuana a federal crime." *Feinberg v. C.I.R.*, 808 F.3d 813, 816 (10th Cir. 2015) (Gorsuch, J.). That is enough to tell us that the national marketplace Peridot seeks to further open is one that federal law disallows.

There is an ongoing debate in our country, at both the national and local levels, about whether marijuana should be legalized and, if so, what kinds of regulatory schemes should govern. But when Congress has made the national marketplace illegal, the premises of the dormant Commerce Clause do not require the courts to leapfrog the political process and inaugurate free trade in the market for marijuana dispensary licenses. And we are uncertain where the contrary logic would take us, if for example, a state were to legalize even more harmful drugs, such as heroin. *See Northeast Patients Grp.*, 45 F.4th at 559 (Gelpí, J., dissenting) ("My reluctance to join my colleagues in extending constitutional solicitude to protecting an illegal market is heightened if one were to imagine extending the same logic to relieve burdens on the illicit trade in other Schedule I controlled substances, such as heroin, fentanyl, or cocaine, or indeed most any other black market in goods or services which Congress has determined is harmful to the public interest."). A doctrine of constitutional law that

catapults a state's legalization of an illicit drug into dormant Commerce Clause protection would have courts facilitating, if not creating, the very national marketplaces that Congress has disallowed. This is a far cry from what the dormant Commerce Clause set out to do.

In reaching a different conclusion, the Second Circuit expressed concern that without the protections of the dormant Commerce Clause, "States would then be free today to bake in advantages for their residents should Congress later legalize the market." *Variscite NY Four*, 152 F.4th at 61. But the possibility that Congress might one day legalize marijuana or that marijuana may at some point become reclassified under the CSA provides no basis for the judicial enabling of a marketplace that is presently not supposed to exist as a matter of federal law. *See Raich*, 545 U.S. at 19 (discussing "the federal interest in eliminating commercial transactions in the interstate market in their entirety"). We are not persuaded that the dormant Commerce Clause requires us to contradict Congress's judgment and protect an illegal national marketplace from state restrictions.

The judgments of the district courts are

**AFFIRMED.**